646 A.2d 557

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Larry RUSH, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 7, 1993.

Decided Aug. 23, 1994.

Michael G. Floyd, Norristown, for L. Rush.

Catherine Marshall, Ronald Eisenberg, Philadelphia, for Com.

Robert A. Graci, Harrisburg, for Atty. Gen.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY, and MONTEMURO, JJ.

### OPINION OF THE COURT

FLAHERTY, Justice.

In June of 1988, in a trial by jury in the Philadelphia Court of Common Pleas, the appellant, Larry Rush, was convicted of murder of the first degree, robbery, burglary, and possession of an instrument of crime. In connection with the murder conviction, a sentencing hearing was held, as required by 42 Pa.C.S. § 9711, and appellant was sentenced to death. Terms of imprisonment were imposed for the other offenses. The present direct appeal ensued. We affirm.

The evidence at trial established the following facts. On the afternoon of May 8, 1987, Veranica James Hands was to meet her husband and some friends at a shopping mall in Philadelphia. She failed to appear, however, so her husband went looking for her. He went to their residence, an apartment located on the two upper floors of a three story duplex on Federal Street. He was surprised to find that the door to the building and the door to the apartment were unlocked. After inspecting the lower floor of the apartment, he proceeded to the bedroom area on the third floor. There, on the stairway landing, he found the body of his wife. The body, clad in a bathrobe, was partially covered with a blanket and pillows. Mrs. Hands, who was eight and one-half months pregnant, had been bound, gagged, and stabbed to death. She suffered more than fifty stab wounds, many of which

punctured vital organs. A number of the wounds also fatally penetrated her unborn baby.

The third floor of the apartment had been partially ransacked. Underclothing had been removed from Mrs. Hands and thrown on the floor. Other clothing was strewn about the area. Cabinet drawers were open. Cologne had been spread around the bedroom. Pocket change, paper currency, an imitation Rolex watch, a high school ring belonging to Mrs. Hands, a gold chain bracelet belonging to Mr. Hands, other watches, rings, jewelry, and a pair of fingerless sporting gloves were missing from the bedroom.

There were no signs that the apartment had been forcibly entered. A bedroom window, usually kept closed, was open. The window was normally opened only when Mrs. Hands would look down to the street level to see who was ringing the doorbell. This, along with the fact that the apartment doors were unlocked, indicated that Mrs. Hands had unlocked the doors to allow entry.

Late on the day of the crime, one of appellant's acquaintances, Jerry McEachin, encountered appellant at McEachin's residence in Philadelphia. Appellant appeared very nervous and scared, and attempted to flush papers from his pockets into a toilet. He showed McEachin a "MAC" card which bore the name of Mrs. Hands, a high school ring which bore her initials, a man's gold chain bracelet, various other jewelry, an imitation Rolex watch, other watches, coins, paper currency, and a pair of fingerless sporting gloves.

Appellant repeatedly peeked out of a window and told McEachin that he was checking to see if the police were looking for him. He said that he had just stabbed his cousin, a woman who lived on Federal Street, and that he committed the stabbing with a knife that he found in the victim's apartment. (Mrs. Hands was, in fact, related to appellant as a very distant cousin.) Appellant also told McEachin that he had, in the past, committed a stabbing in which he wounded a woman repeatedly. McEachin noticed blood on appellant's shoelaces. Appellant said that, after committing the present stabbing, he

washed blood from the knife and put the knife back in its place in the victim's apartment.

The same day, after learning that appellant had been residing on the first floor of the duplex where the victim resided, police went to the home of appellant's mother. Appellant approached the front of the house, but, upon seeing the police, fled.

Around 2:00 a.m. on the following day, May 9, 1987, McEachin noticed appellant hiding under a truck in front of McEachin's residence. Appellant asked whether any police officers were in the vicinity, and, upon being told that there were not, he emerged. Later that morning, McEachin and appellant attempted to use the victim's MAC card and visited a number of jewelers to sell some of the victim's jewelry. Appellant later removed his shoes, threw them into a trash dumpster, and told McEachin that he hoped he had not left any bloodstains or footprints at the crime scene.

The jewelry that appellant sold was eventually recovered by police and identified as belonging to Mrs. Hands. Appellant's fingerprints were found on containers that held pocket change in the victim's bedroom. Appellant's thumbprint, in a red stain that was ostensibly blood, was found on a doorjamb beside the victim's body.

In all cases where a sentence of death has been imposed, a determination is made by this court as to whether the evidence is sufficient to sustain a conviction for murder of the first degree. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), cert. denied, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). In the present case, the evidence, as heretofore described, is more than sufficient to establish guilt beyond a reasonable doubt. Appellant's detailed admissions to McEachin, possession of the victim's property, and bloody fingerprint at the crime scene provided more than adequate evidence to sustain the jury's finding of guilt.

Appellant contends that the trial court erred in allowing the jury to see various allegedly inflammatory photographs. The

photos consisted of four black and white shots depicting the position of the victim's body at the crime scene.

 The admissibility of photos of the corpse in a homicide case is a matter within the discretion of the trial court, and only an abuse of discretion will constitute reversible error. *Commonwealth v. McCutchen,* 499 Pa. 597, 602, 454 A.2d 547, 549 (1982). The determinative inquiry is whether the photos have evidentiary value that outweighs the possibility of inflaming the minds and passions of the jurors. *Id.* As stated in *McCutchen,*

> A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt.

499 Pa. at 602, 454 A.2d at 549. Further, the condition of the victim's body provides evidence of the assailant's intent, and, even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs. *Id.* at 603, 454 A.2d at 550. Accord *Commonwealth v. Jacobs,* 536 Pa. 402, 406–409, 639 A.2d 786, 788–89 (1994).

██ In this case, although there was testimony from a medical examiner regarding the condition of the victim's body, admission of the photos was well grounded. The photos served to provide the jury with a better understanding of the crime scene. They also exposed the malicious manner in which the murder was committed. The jurors, by gaining insight into the full extent of the harm wrought, were placed in a better position to assess the nature and intent of the

crime's perpetrator. "A jury can often best perform its function if it has not been unduly insulated from gaining a full understanding of the crime itself." *Id.* at 407, 639 A.2d at 789. The photos in the present case served to enhance that understanding. The photos were few in number, and, being black and white rather than color, they safely understated the true nature of the crime scene. No error was committed in allowing them to be shown to the jury.

Appellant next argues that the trial court erred in allowing admission of testimony regarding appellant's prior conviction for robbery, burglary, aggravated assault and attempted rape. The conviction arose from an incident, in 1979, when appellant committed a knife attack upon a woman in her home. The victim of that crime was permitted to testify at the present trial to give details of the attack.

Evidence of prior crimes is generally inadmissible due to the prejudicial effect such evidence has on a jury. *Commonwealth v. Morris,* 493 Pa. 164, 425 A.2d 715 (1981). However, one of the recognized exceptions to this rule is to establish the identity of the perpetrator when the crimes are so similar that logically the same person has committed both acts. As this court stated in *Commonwealth v. Bryant,* 515 Pa. 473, 477–78, 530 A.2d 83, 85–86 (1987),

> As stated in *Commonwealth v. Wable,* 382 Pa. 80, 84, 114 A.2d 334, 336 (1955):
>
>> [E]vidence of other crimes *is* admissible when it tends to prove a *common scheme,* plan or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others or to establish the identity of the person charged with the commission of the crime on trial,—in other words where there is *such a logical connection* between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other.
>
> (Emphasis added).... Indeed, this Court has often cited McCormick, *Evidence,* Sect. 190 (1972 2d ed.), wherein evidence of other crimes is said to be admissible:

To prove other like crimes by the accused *so nearly identical in method* as to earmark them as the handiwork of the accused. Here *much more is demanded than the mere repeated commission of crimes of the same class,* such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a *signature.*

(Emphasis added) (Footnotes omitted).

To establish similarity, several factors to be considered are the elapsed time between the crimes, the geographical proximity of the crime scenes, and the manner in which the crimes were committed. *Commonwealth v. Clayton,* 506 Pa. 24, 483 A.2d 1345 (1984). In the present case, eight years separated commission of the crimes in question. Normally such a lengthy interval would cause the occurrences to be considered too remote; however, for most of this time (with the exception of eighty-four days) appellant was incarcerated. Excluding this imprisonment, a time span of eighty-four days is within the acceptable remoteness standard. See *Commonwealth v. Hughes,* 521 Pa. 423, 459, 555 A.2d 1264, 1283 (1989) (ten months between crimes not remote). Cf. *Commonwealth v. Newman,* 528 Pa. 393, 400, 598 A.2d 275, 278–79 (1991) (eighteen months between crimes not remote). Further, each crime occurred in a similar geographic location (the first in West Philadelphia, the second in South Philadelphia).

Citing the requirement that the *modus operandi* be so similar that it appears that both crimes were the work of a common perpetrator, appellant relies upon *Bryant, supra,* to argue that it was error to admit the conviction of the prior crime. This court held that merely because the crimes in *Bryant* were committed at night and the perpetrators were described as wearing dark jackets, this was not sufficient indicia that the same individual was responsible for both acts.

Here, however, there are sufficient similarities to warrant the conclusion that one individual committed both crimes. In both cases the intruder gained non-forcible entry, ostensibly by ringing the doorbell. Both victims were neighbors of the

appellant and had only recently been introduced to him. Both were attacked while alone in their third floor bedrooms in apartment buildings where appellant resided on the first floor. The victims, both of whom were black, female, and relatively young, had their underclothing or nightclothes pulled from them. Both were then physically restrained and attacked with knives obtained from their own apartments. The assailant repeatedly stabbed both victims until death (or, in the 1979 attack, apparent death) occurred. Mrs. Hands was stabbed more than fifty times, and the victim of the previous attack was stabbed eight times. In each case the apartment was ransacked, yet the only valuables taken were small items from the bedroom, i.e., coins, watches, etc. In each case the perpetrator cleaned the borrowed knife and left it at the scene of the crime. *Bryant* is distinguishable because the details of the crimes did not point to a similar criminal pattern and were common elements found in most burglary situations; here both crimes contain uniquely similar attributes sufficient to allow the prior conviction into evidence.

The trial court carefully instructed the jury as to the limited purpose, to wit, identification of the perpetrator, for which evidence of the prior crime could be considered. Admission of the evidence was not error.

■ Appellant next contends that trial counsel was ineffective for failing to object to certain testimony from Harold James. James, a second cousin to appellant, was the father of Mrs. Hands. James, who was formerly a police officer in Philadelphia, testified that shortly after learning of the murder of his daughter he visited the scene of the crime and then went to a police station to speak with a homicide detective. While waiting to see the detective, he encountered Aaron Pringle. Pringle lived in the first-floor apartment of the victim's building. Pringle informed James that appellant, too, had been living on the first floor. James subsequently spoke with the detective and told him that appellant should be the prime suspect. James' testimony regarding his conversation with the detective is alleged to have been objectionable as hearsay. Specifically, James testified:

Q. And what, if anything, did you tell him?

A. I told Detective Morton that *as a result of my conversation with Pringle that [appellant] should be the prime suspect.*

Q. Now, do you know the defendant in this case?

A. Yes.

Q. How do you know him?

A. He's my second cousin.

(Emphasis added).

In the face of the compelling evidence of appellant's guilt introduced at trial, such as appellant's admissions to McEachin, bloody fingerprint at the crime scene, and possession of the victim's property, James' testimony was of minor significance. Nevertheless, appellant contends that the testimony conveyed to the jury that Pringle implicated him as the guilty party, rather than that James, based on his acquaintance with appellant and experience as a police officer, independently concluded that appellant should be the prime suspect. It is asserted that trial counsel should have objected, on the basis of hearsay, to this alleged expression of Pringle's opinion regarding appellant's guilt.

Examination of James' testimony reveals, however, absolutely no reference to Pringle's having told James anything incriminating about appellant. Even if James' testimony could conceivably have been interpreted as implying that Pringle said something of an incriminating nature, that implication was fully negated during cross-examination when defense counsel elicited the reason that James told the detective that appellant should be the prime suspect:

Q. Now, the statement you gave to Detective Morton must have occurred after your discussion ... with Aaron Pringle, correct?

A. Yes.

Q. And did you make your suggestion regarding [appellant] as a prime suspect before you gave your statement to Morton?

A. Yes.

Q. In fact, would that have been the first thing you did, tell him who *you think* is the suspect?

A. *Yeah, once I found out that [appellant] had been on the first floor.*

(Emphasis added).

This testimony plainly established that James was giving his own opinion that appellant was the suspect, rather than relaying an opinion held by Pringle. It also established that he formed his opinion based on the simple fact that appellant "had been on the first floor" of the victim's building. The fact that appellant resided on the first floor was undisputed at trial, and was established by other witnesses.

Thus, defense counsel effectively used cross-examination to eliminate any possibility that James' testimony might have been misunderstood as conveying, by implication, an incriminating statement by Pringle. Given this, and the fact that James' testimony on direct examination contained no express hearsay statement, it cannot be said that appellant was prejudiced by counsel's failure to object. See *Commonwealth v. Clemmons,* 505 Pa. 356, 362, 479 A.2d 955, 958 (1984) (defendant must show prejudice from counsel's alleged ineffectiveness).

■ Appellant further contends that trial counsel was ineffective for failing to object to certain remarks made by the prosecutor during closing arguments. One of these was a very brief remark that the specific intent to kill necessary to a conviction for murder of the first degree could be inferred from the severity of the victim's wounds, the fact that the victim was bound and gagged, and testimony given by the victim of the stabbing that appellant committed in 1979. Appellant asserts that testimony from the victim of the 1979 crime was admitted to establish the identity of the perpetrator of the present crime and not as a basis to infer specific intent to kill, and that counsel should, therefore, have objected. Examination of the record reveals that this assertion of counsel's ineffectiveness is meritless. At the end of the prosecu-

tor's closing remarks, counsel *did* object to the remark in question, and the trial court issued in its charge a thorough curative instruction, emphasizing that evidence of the 1979 crime should be considered only on the issue of identity, thereby eliminating any arguable prejudice.

The other remark to which appellant claims counsel should have objected was a statement by the prosecutor that Harold James, the victim's father, told a police detective that appellant should be regarded as the prime suspect because, as soon as he heard that appellant had been residing on the first floor of the victim's building, he recognized that the crime bore appellant's "signature." Appellant claims that there was no testimony that James knew of the similar crime committed by appellant in 1979, and, therefore, that it was purely speculative that James could have recognized the present crime as bearing the signature of the same perpetrator.

It is well established that a prosecutor, in his closing argument, can comment on the evidence introduced at trial as well as the legitimate inferences arising therefrom. *Commonwealth v. Lawson*, 519 Pa. 175, 190, 546 A.2d 589, 596 (1988); *Commonwealth v. Anderson*, 490 Pa. 225, 229, 415 A.2d 887, 888 (1980). Harold James had been a Philadelphia police officer for twenty-two years and, most importantly, was appellant's second cousin. It was reasonable to infer, therefore, that he was aware of the crime appellant committed in Philadelphia in 1979. The prosecutor's comment that James recognized the "signature" of appellant was, therefore, a reasonable inference based on the evidence. Defense counsel had no basis to object.

The next argument is that trial counsel was ineffective for eliciting testimony during cross-examination that, when police arrested appellant, they did so because he was wanted for a stabbing attack that was unrelated to the present crime.

A police officer testified for the prosecution that, when appellant was arrested, he was found hiding behind some clothes in a closet at the home of one of his friends. The

officer did not mention that the arrest was made for a crime unrelated to the present murder. The impression conveyed to the jury was, therefore, that appellant was hiding from police because he was conscious of guilt and was trying to avoid apprehension for the murder of Mrs. Hands. Ostensibly to counter that impression, defense counsel, at the express request of appellant, asked the following question during cross-examination:

Q. Detective, when you went to arrest [appellant].... What was the crime for which you were arresting him?

A. I was arresting him on a warrant for the stabbing of a lady that happened in a bookstore on Germantown Avenue.

By eliciting testimony that appellant was arrested in connection with a stabbing committed at a bookstore in Philadelphia, this being a matter that was obviously unrelated to both the present murder and the crime committed by appellant in 1979, counsel made the jury aware of appellant's alleged involvement in extraneous crime.

The record reveals, however, that counsel was expressly instructed by appellant to elicit the testimony in question. Indeed, appellant *insisted* that counsel do so. Before complying with appellant's directive, and being aware of the risks associated with the introduction of evidence of extraneous crime, counsel brought the matter to the attention of the court in chambers. Counsel told the court that he had explained to appellant that the prosecution was not in a position to introduce evidence of the unrelated crime and that, if he inquired about the reasons for appellant's arrest, facts relating to that crime would likely be revealed to the jury. Appellant nevertheless insisted that the inquiry be made. The court instructed counsel that, given appellant's directive, counsel should proceed to inquire about the crime for which appellant was arrested.

To establish ineffectiveness of counsel it must be shown that counsel's action had no reasonable basis. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987). Informing the jury that appellant was arrested for another crime

was, obviously, a tactic of uncertain consequence, but it was not one that lacked a reasonable basis designed to further the defense. The tactic clearly served to dispel inferences that appellant was conscious of guilt for the murder of Mrs. Hands and that he took flight to avoid arrest for that crime. See *Commonwealth v. Savage*, 529 Pa. 108, 112–14, 602 A.2d 309, 310–11 (1992) (counsel's disclosure of defendant's prior criminal record was not ineffective, where it served a reasonable strategic purpose). Also, given appellant's insistence on the tactic employed, it is particularly meritless for him to argue that counsel was ineffective for pursuing it. Cf. *Commonwealth v. Holloway*, 524 Pa. 342, 350–51, 572 A.2d 687, 691–92 (1990) (claim that counsel was ineffective for allowing defendant to testify, where defendant insisted on doing so, deemed meritless).

Finally, appellant contends that, during the jury selection process, counsel was ineffective for failing to request that the prosecution provide reasons for the exercise of its peremptory challenges. It is alleged that the prosecution improperly used its challenges to exclude blacks from the jury. See *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (peremptory challenges cannot be used to exclude jurors on the basis of race); *Commonwealth v. Young*, 536 Pa. 57, 67–71, 637 A.2d 1313, 1318–19 (1993) (applying *Batson* ). In *Commonwealth v. Spence*, 534 Pa. 233, 246, 627 A.2d 1176, 1182 (1993), we stated:

> In *Batson,* the Supreme Court held that a defendant is required to demonstrate a prima facie case that the prosecutor improperly used peremptory challenges. The defendant does this by showing that the prosecutor discriminated in the jury selection process based on evidence of the use of peremptory challenges. After such demonstration, the trial court must consider the totality of the circumstances to determine whether challenges were used to exclude venirepersons on account of their race, and, if so, the trial court may properly require the prosecutor to explain his or her reasons for the challenge.

Thus, trial counsel would have had no right to an explanation for the prosecution's use of its peremptory challenges unless a prima facie case of discrimination had first been established. Nothing in the record indicates that counsel could have established such a case.

This was not a racially sensitive case. No racial issues were involved. Both appellant and the victim were black. Many of the witnesses presented by the prosecution and the defense were black. Appellant was convicted by a jury on which both blacks and whites were represented.

Although trial counsel did not challenge the prosecution's use of its peremptory challenges, post-verdict counsel did raise the issue. The trial court ruled that the issue was meritless, reasoning that the defense failed to make a showing that the prosecution intentionally excluded black jurors. The court noted, "While the record does not disclose the racial composition of the jurors, this court specifically recalls that black jurors were selected." As we stated in *Commonwealth v. Young,* 536 Pa. at 69, 637 A.2d at 1319, "The trial court's determination as to discriminatory intent is a finding of fact and must be accorded great deference on appeal." We have examined the record and find no basis to disagree with the trial court's conclusion. Counsel was not, therefore, ineffective for failing to pursue this issue.

Imposition of the death sentence in this case was based on the jury's finding of two aggravating circumstances and no mitigating circumstances.[1] The aggravating circumstances were those set forth in 42 Pa.C.S. § 9711(d)(6), (9), to wit, that appellant committed the murder in the course of a felony, and that appellant had a significant history of felony convictions involving the use or threat of violence to the person. The evidence was clearly sufficient to establish these

1. With regard to the jury's finding that no mitigating circumstances were present, we note that the defense attempted to establish as a mitigating factor "the character and record of the defendant and the circumstances of his offense," 42 Pa.C.S. § 9711(e)(8). However, the defense merely presented testimony from some of appellant's close relatives who stated that appellant treated them nicely, had no education beyond sixth grade, and had a father who died at a young age.

aggravating circumstances beyond a reasonable doubt. See 42 Pa.C.S. § 9711(c)(1)(iii) (proof beyond reasonable doubt required with respect to aggravating circumstance); 42 Pa. C.S. § 9711(h)(3)(ii) (appellate review of evidence relating to aggravating circumstance).

The present murder was, as the jury found in the guilt phase of trial, committed in the course of a burglary and robbery. Also, appellant had an extensive record for crimes of violence to the person, including not only his 1979 offense but a number of additional convictions that were introduced into evidence at the penalty hearing. These included convictions for robbery, kidnapping, and aggravated assault.

In accordance with our duty, under 42 Pa.C.S. § 9711(h)(3)(iii), to review sentences of death from the standpoint of their proportionality to sentences imposed in similar cases, *Commonwealth v. Zettlemoyer,* 500 Pa. at 63, 454 A.2d at 961, we have reviewed the sentence imposed on appellant in light of sentencing data compiled and monitored by the Administrative Office of Pennsylvania Courts. See *Commonwealth v. Frey,* 504 Pa. 428, 443, 475 A.2d 700, 707–08 (1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). We perceive no excess or disproportionality in the sentence imposed. Further, the record does not provide any basis for belief that the sentence was the "product of passion, prejudice or any other arbitrary factor," 42 Pa.C.S. § 9711(h)(3)(i). Accordingly, the sentence must be affirmed.

Judgment of sentence affirmed.[2]

LARSEN, J., did not participate in the consideration or decision of this case.

MONTEMURO, J., who was an appointed justice of the court at the time of argument, participated in the decision of this case in his capacity as a senior justice pursuant to Judicial Assignment Docket No. 94 R1801 due to the unavailability of

2. The prothonotary of the Supreme Court is directed to transmit the complete record in this case to the Governor, 42 Pa.C.S. § 9711(i).