## COMMONWEALTH of Pennsylvania, Appellee,

v.

## Gregory MILES, Appellant.

Superior Court of Pennsylvania.

Argued Sept. 4, 2003.
Filed March 18, 2004.

Alston B. Meade, Philadelphia, for appellant.

Lorie K. Dakessian, Asst. Dist. Atty., Philadelphia, for Com., appellee.

BEFORE: DEL SOLE, P.J., JOHNSON, HUDOCK, FORD ELLIOTT, JOYCE, STEVENS, MUSMANNO, TODD and KLEIN, JJ.

OPINION BY MUSMANNO, J.:

¶ 1 Gregory Miles ("Miles") appeals from the judgment of sentence imposed after he was convicted of robbery (two counts) and possession of an instrument of crime.[1] We granted *en banc* review in this case to consider the issue raised by Miles's second claim on appeal, *i.e.*, whether, in light of *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), we may address an issue of ineffective assistance of trial counsel on direct appeal, where the ineffectiveness of counsel, or lack thereof, may be apparent on the record and where the trial court has addressed the ineffectiveness claim in its Opinion, but no hearing was conducted on the ineffectiveness claim. Due to our disposition of Miles's first issue on appeal, however, we do not reach Miles's second claim.

¶ 2 The pertinent facts of this case are as follows:

> On January 22, at about 8:35 PM[,] Miss Joyce Jones ["Jones"] returned home from dropping off a friend at Broad and Erie Streets in Philadelphia. She parked her car directly under a streetlight, for safety reasons, outside of her house at the 2100 block of Estaugh Street. She got out of the car and went to the back of the car to retrieve something. From behind, a person she identified as [Miles] put a silver gun to her head and told her to give him her money. She turned around and looked into [Miles's] face while he kept asking for all of her money. She concentrated on [Miles's] face, thinking his was the last face she would see before she died. She gave him two purses she had and a diamond bracelet. When she was facing him, [Jones] testified that he was poking the gun into her chest and he was shaking nervously. There was also a woman standing near him. She was a light skinned black woman, very tall and thin. After about 10 minutes[,] [Miles] and the woman left. [Jones] immediately called the police and gave a detailed description, including the coat he was wearing, dark in color with a gray hoody underneath. The Commonwealth showed [Jones] the jacket [Miles] was wearing when he was arrested and asked if she recognized it. She confirmed that it was the jacket [Miles] wore when he robbed her.

> Two days later, detectives came to her home with a photo spread of suspects. Immediately, [Jones] picked [Miles's] photograph. She consistently identified him at the preliminary hearing and during trial. She testified that she was able to get a good look at his face because they were directly under a street light.

> Shortly after [Jones] was robbed, on the same night, in the same neighborhood, Mr. Harold Philip ["Philip"] had gone to the Chinese food take-out at 2022 Hunting Park Avenue when a man he later identified as [Miles] approached

1. 18 Pa.C.S.A. §§ 3701, 907.

him. [Miles] pulled a silver gun from his waistband and pointed it into [Philip's] chest and demanded that he give him all of his money. [Philip] saw the hand of another person outside, he described it as light-skinned, who repeated [Miles's] demands for money. He described the same jacket that [Jones] described, dark blue or black, of a denim-like material, with a hood underneath. The Commonwealth produced the jacket, hoody and cap which [Miles] was wearing when he was arrested. [Philip] testified they looked like the items [Miles] was wearing when he robbed him.

[Philip] immediately chose [Miles's] picture when he went to the station two days later. Out of eight photographs, [Philip] chose [Miles's] without hesitation. He testified that he was 102 percent sure that he was [the] man who robbed him. [Philip] also immediately identified him at the preliminary hearing.

[Miles] presented alibi testimony from his girlfriend, Kipaji Hankins, who is the mother of his child, Charina Hankins, his girlfriend's sister and Charina's boyfriend, Alan Clark. All three witnesses testified that [Miles] was in Charina and Kipaji's home for several days, watching movies. They testified that he did not leave the house for any reason, for several days, including January 22, 2000.

In rebuttal to the alibi witnesses, the Commonwealth elicited the testimony of James Siebert ["Siebert"] who testified that he went to the Chinese food take-out at 2022 Hunting Park Avenue on January 24, 2000. While waiting for his food, a man he later identified as [Miles] approached him, put a silver gun to his head and robbed him. After robbing [Siebert], [Miles] walked leisurely out of the store and continued to walk away. [Siebert] followed him. When he walked by the police station, [Siebert] went in and told the police the circumstances. He was then taken by a policewoman to a location where other officers had [Miles] in the back seat of a patrol car. [Siebert] confirmed that he was the man who had just robbed him.

Trial Court Opinion, 4/25/02, at 1–4.

¶ 3 Miles was charged with numerous offenses in connection with the above circumstances. After a jury trial, he was convicted of the abovementioned charges. On November 28, 2001, the trial court sentenced Miles to concurrent prison terms of ten to twenty years on the robbery convictions, and a consecutive sentence of two and one-half to five years on the conviction of possession of an instrument of crime. Miles filed a Petition for reconsideration of sentence, which the trial court denied. Miles then filed the instant timely appeal. On appeal, Miles raises the following issues:

1. Whether the trial court erred by admitting the testimony of James Siebert who testified about another crime allegedly committed by Miles subsequent to the January 22, 2001 robberies of which Miles was convicted?

2. Whether trial counsel was ineffective for failing to properly impeach James Siebert's in-court identification of the silver handgun allegedly used in the robbery with a prior statement in which Siebert claimed that the handgun was gray?

3. Whether the trial court abused its discretion by imposing an unduly harsh or patently excessive sentence for the crimes of which Miles was convicted?

*See* Brief of Appellant at vi.

¶ 4 Miles first contends that the trial court erred by admitting Siebert's testimony about a robbery committed by Miles two days after the robberies of

Jones and Philip. This testimony was offered on rebuttal, after Miles offered the testimony of several alibi witnesses, each of whom indicated that Miles had been at his girlfriend's house all day on January 22, 2001, the day that Jones and Philip were robbed.

¶ 5 The admission of evidence is within the sound discretion of the trial court, and will be reversed on appeal only upon a showing that the trial court clearly abused its discretion. *Commonwealth v. Lilliock*, 740 A.2d 237 (Pa.Super.1999). Similarly, the admission or rejection of rebuttal evidence is also within the sound discretion of the trial court. *Commonwealth v. Weiss*, 565 Pa. 504, 776 A.2d 958 (2001).

¶ 6 In considering Miles's claim, we note first that Siebert's testimony was not proper rebuttal evidence, as Siebert's testimony was not relevant to "rebut" the testimony of Miles's alibi witnesses. Those witnesses testified that Miles was at his girlfriend's home, without going out, for several days, including January 22, 2001, the date of the robberies of Jones and Philip. Siebert's testimony that Miles robbed him on January 24, 2001, did not "rebut" Miles's alibi testimony for the crimes that occurred two days earlier, on January 22, 2001. *See Commonwealth v. Hickman*, 453 Pa. 427, 309 A.2d 564, 567 (1973) (holding that police lieutenant's testimony that two of eighty bullets found in a bullet trap came from the murder weapon was not proper rebuttal evidence because it did not actually rebut defendant's evidence that he had never owned a gun of the murder weapon's type).

¶ 7 Further, Siebert's testimony, which constituted evidence of other crimes, was inadmissible. The Pennsylvania Rules of Evidence provide as follows with regard to the admissibility of "other crimes" evidence:

(1) Evidence of other crimes, wrongs, or acts of a defendant is not admissible to prove the character of a person in order to show action in conformity therewith.

(2) Evidence of such other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

(3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.

Pa.R.E. 404(b). The Commonwealth contends that Siebert's testimony was admissible to establish Miles's identity as the perpetrator of the crimes, and as evidence of the "complete story of the case." Evidence of other crimes may be admissible "to establish the identity of the perpetrator when the crimes are so similar that logically the same person has committed both acts." *Commonwealth v. Rush*, 538 Pa. 104, 646 A.2d 557, 561 (1994). "[M]uch more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts." *Id.* (quoting McCormick, Evidence, § 290 (2nd ed.1972)). "The device used must be so unusual and distinctive as to be like a *signature.*" *Id.* (emphasis in original).

¶ 8 In the instant case, Philip testified that at 8:30 p.m., on January 22, 2001, he was inside the Chinese store, when Miles approached him, pulled out a gun, and demanded money. N.T., 8/7/01, at 91. Philip stated that the gun was silver with a black handle. *Id.* at 92. He indicated that there was another person standing outside, who said to Philip, "Give him the money." *Id.* at 91. Philip told the police that the

person who robbed him had on a "blue kash [sic] material jacket," a gray hoody, a black knit cap, blue denim pants, and light brown boots. *Id.* at 95, 96, 100. According to Philip, Miles's hair was braided at the time of the robbery. *Id.* at 102. Two days later, Philip identified Miles from a police photo array, and also identified Miles in court. *Id.* at 97, 89.

¶ 9 Jones testified that at 8:35 p.m. on January 22, 2001, Miles robbed her while she was walking to the back of her car. *Id.* at 48. During the robbery, Miles poked a silver gun at her chest. *Id.* at 52, 57. Jones noticed that there was a young, tall, thin light-skinned black girl standing "over on the side." *Id.* at 54. She described the robber to the police as young, about five feet, six inches to six feet tall, thin, with light brown skin. *Id.* at 59. Jones stated that the robber wore a dark-colored jacket, with a hood on his head. *Id.* Jones identified Miles two days later from a police photo array. *Id.* at 61.

¶ 10 Siebert testified that Miles robbed him at the Chinese store on January 24, 2001, at 9:00 p.m. *Id.* at 281. He stated that Miles put a gun to his head and demanded money. *Id.* at 282. Siebert identified Miles, who was sitting in a police car shortly after the robbery, and testified that Miles had a skull cap on his head at the time. *Id.* at 283, 289.

¶ 11 The above evidence does not establish distinctive similar attributes of the three robberies so as to make it logical that the same person committed each crime. Although the Philip and Siebert robberies occurred at the same Chinese store, the robbery of Jones occurred on the street several blocks away. In addition, there was nothing unique or distinctive about the robber's *modus operandi.* The robber simply pointed a gun at the victim and asked for money. Further, the descriptions offered by the victims were not distinctive. In addition, during the robberies of Jones and Philip, another person was present with Miles, but this person was not observed by Siebert. Finally, the fact that a silver or gray handgun was used in the robberies does not make the robberies uniquely similar. *See Rush,* 646 A.2d at 561 (holding that evidence of two assault crimes contained "uniquely similar attributes" to warrant the conclusion that one individual committed both crimes). Thus, we conclude that the trial court erred in admitting evidence of the Siebert robbery to prove Miles's identity as the perpetrator of the other robberies.

██ ¶ 12 We also conclude that, contrary to the Commonwealth's argument, Siebert's testimony would not be admissible as part of the "history of the case." That exception is not included in Rule 404(b)(2) of the Rules of Evidence. Further, the robbery involving Siebert is more properly characterized as a separate incident, rather than an extension of, or part of, the Jones and Philip robberies which occurred two days earlier. *See Commonwealth v. Lee,* 297 Pa.Super. 216, 443 A.2d 804, 809 (1982) (holding that the defendant's arrest on an unrelated matter twenty days after the robbery for which he was on trial, was not admissible as part of the "history of the case"). Thus, the trial court erred in admitting Siebert's testimony on the basis that it was part of the "history of the case."

██ ¶ 13 Although we conclude that the admission of Siebert's testimony was error, a new trial is not required if the trial court's error was harmless and could not have contributed to the verdict. *Commonwealth v. McCloskey,* 441 Pa.Super. 116, 656 A.2d 1369, 1377 (1995). Trial court error will be considered harmless where "(1) the error did not prejudice the defendant or the prejudice was *de minimis;* or (2) the erroneously admitted evi-

dence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." *Commonwealth v. Lilliock*, 740 A.2d 237, 246 (Pa.Super.1999).

¶ 14 For the reasons we will discuss herein, we conclude that Siebert's testimony prejudiced Miles, and that the prejudice was not *de minimis*. In addition, Siebert's testimony was not "merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence." *Id.* Further, we cannot conclude that "the properly admitted and uncontradicted evidence" of Miles's guilt "was so overwhelming and the prejudicial effect of the error [in admitting Siebert's testimony] was so insignificant by comparison that the error could not have contributed to the verdict." *Id.*

¶ 15 The evidence of Miles's guilt consisted entirely of the testimony of the two victims, Jones and Philip, who each identified Miles as the perpetrator, and who indicated that they were robbed within a short period of time in the same geographic vicinity. Jones's and Philip's descriptions of the perpetrator's appearance were not distinctive and did not demonstrate that the robberies were conducted in a unique fashion such that the perpetrator's method could be termed a "signature." No other evidence was presented to link the Jones and Philip robberies or to establish that Miles was the perpetrator of each robbery.

¶ 16 On the other hand, Siebert's testimony that he was robbed in the same location as Philip provided an additional, compelling fact from which the jury could

have inferred and concluded that Miles committed the Jones and Philip robberies two days earlier. Thus, Siebert's testimony concerning the subsequent robbery was clearly prejudicial to Miles. Although the evidence provided by Jones and Philip was substantial, it was outweighed by the prejudice resulting from the compelling but erroneously admitted evidence of the subsequent robbery of Siebert. We cannot conclude that the erroneous admission of Siebert's testimony could not have contributed to the verdict. Accordingly, the error in admitting Siebert's testimony was not harmless.

¶ 17 Because the testimony of Siebert was improperly admitted and prejudicial, Miles is entitled to a new trial. Thus, we do not reach the other two issues raised by Miles in the present appeal.

¶ 18 Judgment of sentence vacated; case remanded for new trial in accordance with this Opinion; jurisdiction relinquished.

¶ 19 Judge HUDOCK files a Dissenting Statement in which Judge STEVENS joins.

## DISSENTING OPINION BY HUDOCK, J.:

¶ 1 The testimony of the two victims in this case was not seriously impeached in any way. The victim, Joyce Jones, testified that she was robbed after parking her car directly under a streetlight. When the robber placed a silver gun to her head, she turned around and looked into his face. She concentrated on his face, thinking "his was the last face she would see before she died." She also saw that a light-skinned black woman, very tall and thin, was standing next to the robber. She observed these two individuals for approximately ten minutes. After the robbers left, she immediately called the police and gave a detailed description of the robbers, and of

the coat the man was wearing. When Appellant was arrested, the Commonwealth showed Jones the jacket Appellant was wearing when he was arrested, and she identified it as the jacket she had seen at the time of the robbery. More importantly, two days later, she picked Appellant's photograph out of a photo spread of suspects shown to her by detectives. She further testified that she was able to get a good look at Appellant's face because they were directly under a street light.

¶ 2 The evidence further shows that shortly after Jones was robbed, Harold Philip was robbed. After Appellant was arrested, Philip also recognized the jacket, hoody and cap which Appellant was wearing when he was arrested. Most importantly, Philip "immediately" chose Appellant's picture when he went to the station two days later. Out of eight photographs, Philip chose Appellant's without hesitation. He further testified that he was 102% sure that he was the man who robbed him.

¶ 3 In my opinion, the above stated facts, apparently accepted by the jury, constituted overwhelming evidence of guilt and the prejudicial effect of the error found by the majority, is so insignificant by comparison that the error could not have contributed to the verdict.

¶ 4 I would affirm the judgment of sentence, and accordingly I respectfully dissent.