J-S13019-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ROBERTO TORNER | : | |
| | : | |
| | : | No. 13 MDA 2024 |

Appeal from the Judgment of Sentence Entered August 24, 2023
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s):  CP-40-CR-0002079-2020

BEFORE:  PANELLA, P.J.E., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY KUNSELMAN, J.:                **FILED JULY 10, 2025**

Roberto Torner appeals from the judgment of sentence entered after he was convicted of murder of the first degree, conspiracy, and solicitation.[1]  He challenges the admissibility of evidence that he previously dismembered human corpses as well as the sufficiency of the evidence to prove his intent and identity.  We affirm.

On February 10, 2020, police charged Torner with criminal homicide, conspiracy, and solicitation.  The case was scheduled for a jury trial.

Before trial, the Commonwealth moved *in limine* to admit evidence that Torner had previously participated in dismembering human corpses.  The Commonwealth argued that, based on allegations that Torner dismembered the victim in this case, his prior acts would show his "motive, opportunity, that

_____

[1] 18 Pa.C.S. §§ 2502(a), 903, and 902(a), respectively.

he had a common plan or scheme, and *modus operandi* to use [tools] to conceal incriminating evidence of prior acts of violence." N.T., 5/8/23, at 23; Motion, 5/1/23, at 2 (averring the "evidence tends to prove Torner's motive, opportunity, intent, common plan or scheme, and/or his *modus operandi*"). The trial court reasoned that "dismembering a human body is pretty unique" after a homicide, and the probative value of the evidence would outweigh any prejudicial effect. *Id.* at 31. It reserved ruling on the motion *in limine*.

Trial proceeded from May 9, 2023, to May 18, 2023. The trial court recounted the evidence:

> Jose "Pepe" Herran disappeared in the late fall of 2015. Neither his family, nor his parole officer, Gisella Bassolino, had any idea where he was. He was born in Cuba, but his last known address was 559 Washington Street, Freeland, Pennsylvania, a boarding house, and apartment building then known as "the cottage." The cottage was owned by [Torner].
>
> While investigating Mr. Herran's disappearance, investigators became aware that he last used his cellular telephone on October 21, 2015, in the area of Freeland Borough. Investigators also learned that the cottage was his last known address and that he was acquainted with [Torner]. After years without leads in the investigation, Donald Warren, a former resident of the cottage and sometime employee of [Torner], told police that he knew what had happened to Jose Herran.
>
> Warren told police that he knew that Herran was killed by [Torner] and David Alzugaray sometime in the fall of 2015. He related that [Torner asked him at least 25 times] to participate in the killing[. The night that Herran disappeared, Torner was driving a van with Alzugaray in the passenger seat. Torner told Warren, "we are going to do this right now. It's now or never." Torner smiled and showed Warren a .22 caliber revolver in his waistband. Warren, who was ill, refused to join them. Mr. Herran got in the van, and Torner drove away.] Later that same night, [Torner] and Alzugaray returned to the cottage without Mr.

- 2 -

Herran, wearing different clothes and smelling like fuel oil and smoke. That same night [Torner] and Alzugaray regaled Warren with a macabre story about the details of the killing and dismembering of Jose Herran. It was later determined that Mr. Herran's remains were thrown into the Lehigh River.

[Torner] had also shown Warren a collection of butcher knives, cleavers and a machete which he said were used to dismember Herran. Later, [Torner] gave Warren his .45 caliber model 1911 firearm and directed him to clean it with bleach and ammonia and mutilate the gun's serial numbers and the rifling of the barrel.

Investigators interviewed Alzugaray at the Lackawanna County Jail on May 1, 2018. Alzugaray confessed to killing Jose Herran. He told investigators that he shot Herran with a .22 caliber pistol, burned his clothes, dismembered his body, and threw the remains into the Lehigh River. Alzugaray told investigators that the killing took place at 6851 North Buck Mountain Road, a property owned by [Torner], who, he assured investigators, had nothing to do with the killing. A search of a burn pit on the Buck Mountain Road property resulted in investigators recovering fragments of human bones. The human skull fragments looked like they had been burned and that they most likely belonged to a male.

Special Agent Larry Whitehead interviewed [Torner] about Jose Herran's disappearance in February of 2018. During that interview, [Torner] coyly spoke in hypotheticals about a missing "item" which he said he believed was chopped up into little pieces. Months later, [Torner] was again interviewed by law enforcement. At that time he related that he knew about the murder of Jose Herran. He reported that one night in the fall of 2015 he went to his North Buck Mountain Road property just after Alzugaray killed Herran. He stated that Alzugaray told him that Herran attacked him and that as he was running away from Herran shooting over his shoulder a bullet from his gun struck Herran in the head killing him. [Torner] offered the same explanation to the jury at his trial.

Alba Veras, an associate of [Torner], told police where the dismemberment tools and other weapons used in the homicide were. She took investigators to them in the attic of a former church which was owned by [Torner]. Veras reported to police that she concealed the cleavers and other dismemberment tools at the direction of [Torner]. She also led police to the location of

two guns which were hidden in a hollow cavity of a railing near the altar in the church. Prior to the killing of Herran, [Torner] had, as he had with Mr. Warren, asked Veras to kill Jose Herran, insinuating that by doing so she would prevent future crimes that [Torner] said he knew Herran was preparing to commit.

Trial Court Opinion, 8/9/24, at 1–4 (record citations omitted).

During its case-in-chief, the Commonwealth called Richard DeStefano to testify. Returning to the issue from the motion *in limine*, the trial court overruled Torner's objection to DeStefano retelling what Torner told him about Torner's past in New Jersey.

> Q. What did [Torner] say?
>
> A. He told me on occasion, that when he was younger, that his uncles and, I guess, other gang wars in the town or whatever happened, that he was present when they would chop up bodies and put them in a drain basically.
>
> Q. You mean flush them down the toilet?
>
> A. I think it was more put them down the drain. Chop them up and put them in the drain. I don't remember -- I don't remember a toilet being…

N.T., Trial, 5/9/23–5/18/23, at 916–17.

After having his recollection refreshed, DeStefano testified that Torner said he was not merely present but had in fact participated:

> Q. What did [Torner] say?
>
> A. He said that he used to also participate in cutting up the bodies.

*Id.* at 919.

No limiting instruction was requested or provided for this testimony. DeStefano also testified that Torner asked him to build an incinerator. "[Torner] said that they had an opportunity to make a lot of money, but they

- 4 -

would need a way to get rid of the body and they needed an incinerator." ***Id.*** at 920. DeStefano did not take the question seriously.[2]

The jury found Torner guilty of the above crimes. On August 24, 2023, the trial court sentenced Torner, for murder, to life in prison without parole, and for conspiracy, to 240 months to 480 months of consecutive incarceration. Torner filed post-sentence motions on September 1, 2023, which the trial court denied on November 21, 2023. Torner timely appealed. Torner and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

Torner presents two issues for review:

1. Whether the Trial Court abused its discretion by permitting testimony from Richard DeStefano under Pennsylvania Rule of

---

[2] The prosecutor referenced DeStefano's testimony in closing argument when addressing why Torner asked DeStefano to build an incinerator:

Just like he told Mr. DeStefano, because I got to get rid of a body. I got to get rid of a body. That was in line with the stories that he told DeStefano about his days back in New Jersey when he and his uncles would chop bodies up. Who talks like that? Who says that? It would be wild to believe that Mr. DeStefano just made that up out of thin air.

It would just be coincidence that we have a body that's completely chopped up, dismembered, discarded in this case and he's talking about the fact that he had done it before with his uncles in New Jersey. That's what we do. Cut bodies up.

Mr. DeStefano didn't make that up. He didn't make up the fact that Rob asked him to build an incinerator. Building that incinerator was completely consistent with getting rid of a body. That's what happened in this case. They wanted to get rid of a body.

N.T., Trial, 5/9/23–5/18/23, at 1387–88.

- 5 -

Evidence 404(b) at trial that described Mr. Torner dismembering human bodies when he took part in gang wars in New Jersey decades prior?

2. Whether the evidence was insufficient to prove that Mr. Torner killed Mr. Herran and had the specific intent to kill Mr. Herran?

Torner's Brief at 4.

We address Torner's second issue first, as "he would be entitled to discharge if the evidence was insufficient to support the verdict." *Commonwealth v. Brown*, 186 A.3d 985, 990 n.3 (Pa. Super. 2018) (citing *Commonwealth v. Toritto*, 67 A.3d 29, 33 (Pa. Super. 2013)). Torner frames his issue as a sufficiency challenge. He invokes *corpus delicti* to argue that, excluding any of his own statements, the evidence was insufficient to prove two elements of murder of the first degree. *See Commonwealth v. Fears*, 86 A.3d 795, 808 n.17 (Pa. 2014) (explaining the *corpus delicti* rule; "before introducing an extra-judicial admission, the Commonwealth must establish by independent evidence that a crime has in fact been committed").

When this Court reviews a sufficiency claim, "our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Baker*, 201 A.3d 791, 795 (Pa. Super. 2018) (citing *Commonwealth v. Sanchez*, 36 A.3d 24, 37 (Pa. 2011)). Our task is to "determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt." *Id.* (citing *Commonwealth v. Von Evans*, 163 A.3d 980, 983 (Pa. Super. 2017)).

Generally, a court analyzing evidentiary sufficiency must consider all the evidence from trial, even improperly admitted evidence. **Commonwealth v. Haynes**, 116 A.3d 640, 656 (Pa. Super. 2015) (citing **Commonwealth v. Watley**, 81 A.3d 109, 113 (Pa. Super. 2013) (*en banc*)). "The question of sufficiency is not assessed upon a diminished record." **Commonwealth v. Smith**, 568 A.2d 600, 603 (Pa. 1989) (citing decades of authority).

Torner, however, argues an exception to this rule. He contends that we must not consider evidence of his own statements because there is an issue of the *corpus delicti* being proven beyond a reasonable doubt. In support, he cites **Commonwealth v. Reyes**, 681 A.2d 724, 730 (Pa. 1996), and **Commonwealth v. Oliver**, 416 A.2d 1128, 1129–30 (Pa. Super. 1979) (*per curiam*).

We do not read either case to limit the scope of our review. In **Oliver**, the appellant claimed the trial court, sitting as fact-finder, should have suppressed two statements he made to police. **Oliver**, 416 A.2d at 1129. This Court did not reach the merits of the claim; rather, we accepted the trial court's conclusion that there was ample independent evidence for it to be convinced of the appellant's guilt beyond a reasonable doubt. **Id.** "Where a court sitting without a jury hears prejudicial information, such as incriminating statements or evidence of prior convictions, judgment of sentence will be upheld if the court states that its decision was independent of the prejudicial information and the record supports the court's declaration." **Id.** (citations

omitted). We determined that the record supported the trial court's reasoning and thus rejected the appellant's suppression claim. *Id.* at 1129–30.

In *Reyes*, the appellant was sentenced to death; the Supreme Court of Pennsylvania therefore commenced its review by addressing the sufficiency of the evidence. *Reyes*, 681 A.2d at 725. In doing so, the court considered the appellant's statement that he killed his daughter. *Id.* at 726. After finding the evidence sufficient, the court addressed a *corpus delicti* issue. *Id.* at 727. It affirmed Pennsylvania's "two-tiered" standard for evidence of a defendant's statements: the statements can be admitted if other evidence establishes a *prima facie* case that a crime was committed, but the statements can be considered only if the other evidence proves the existence of a crime beyond a reasonable doubt. *See id.* at 727–29.

After clarifying the law of *corpus delicti*, the court in *Reyes* applied it to the record of the appellant's non-jury trial. *Id.* at 729–30. The Supreme Court agreed with the appellant that the trial court had applied an incorrect standard for considering his out-of-court statements. *Id.* at 730. Only then did the court suggest that its scope of review would be limited:

> [E]ven excluding the alleged erroneously admitted inculpatory statements of Appellant, [as well as derivative evidence], the circumstantial evidence alone was sufficient to convict Appellant of murder.
>
> Where a trial court sitting without a jury states that evidence independent of a defendant's inadmissible statements satisfied it that the defendant's guilt was established beyond a reasonable doubt, a defendant is not entitled to a new trial. *See Oliver*, 416 A.2d 1128. In reviewing the trial judge's finding that, even excluding Appellant's extra-judicial statements, the evidence

> established Appellant's guilt beyond a reasonable doubt, we must determine whether viewing all of the evidence, in the light most favorable to the Commonwealth as verdict winner, supports the factfinder's finding. *See Commonwealth v. Rhodes*, 510 A.2d 1217, 1218 (Pa. 1986).

*Id.* (citations altered).

We do not read either case to limit the scope of our review for a sufficiency claim if *corpus delicti* is at issue. Both opinions rejected evidentiary claims because the trial courts, as finders of fact, concluded that other evidence proved the appellants' guilt beyond a reasonable doubt. That is, any errors were harmless. This analysis aligns with an evidentiary issue, for which the remedy is a new trial. It does not comport with a sufficiency claim, which results in discharge if successful. Notably, the Supreme Court in **Reyes** considered all evidence from trial when it reviewed the sufficiency of the evidence. Therefore, the general rule applies notwithstanding Torner's *corpus delicti* argument: We consider all the evidence from trial to determine whether it was sufficient to prove every element of the crime beyond a reasonable doubt. **Baker**, 201 A.3d at 795; **Haynes**, 116 A.3d at 656.[3]

For the Commonwealth to prove murder of the first degree, the evidence must establish: "(1) a human being was unlawfully killed; (2) the accused was responsible for the killing; and (3) the accused acted with malice and a specific

---

[3] The scope of our review depends on the nature of Torner's claim. Because Torner presents a sufficiency issue, we must review all the evidence admitted at trial. Because Torner does not present an evidentiary issue, we do not opine whether the trial court abused its discretion in its rulings (or whether Torner preserved an evidentiary claim). **See Commonwealth v. Harper**, 230 A.3d 1231, 1240 (Pa. Super. 2020) ("The corpus delicti rule involves the admissibility of evidence, which we review for an abuse of discretion.").

intent to kill." **Baker**, 201 A.3d at 795 (citing **Commonwealth v. Ballard**, 80 A.3d 380, 390 (Pa. 2013)). A person who intends to facilitate a murder and who "aids or agrees or attempts to aid" another person in committing the offense can be "equally criminally liable" as an accomplice. 18 Pa.C.S. § 306; **Commonwealth v. Spotz**, 716 A.2d 580, 585–86 (Pa. 1998).

Here, Torner contests the sufficiency of the evidence to prove that he intended to kill Herran and that he killed Herran. However, the evidence at trial, including Torner's own statements, was sufficient to establish both elements.

Donald Warren and Alba Veras both provided evidence that, if believed by the jury, directly established Torner's criminal culpability. Warren testified that Torner repeatedly asked him to kill Herran, and that before Torner drove off with Herran in the van, Torner said, "we are going to do this right now. It's now or never," showing Warren his gun. Later, Torner and Alzugaray returned without Herran, and they told Warren about how they killed Herran. Torner asked Warren to clean one of the guns used. Similarly, Veras testified that Torner asked her to kill Herran. Later, although Veras understood not to ask questions, Torner asked Veras to clean and hide the guns. This, as well as the remaining circumstantial evidence of Herran's disappearance, including the recovered fragments of a male's skull, provided sufficient evidence for the jury to find that Torner intended to kill Herran and acted as a principal or accomplice to kill Herran. Torner's sufficiency challenge fails.

Torner's remaining issue is a challenge to the trial court's ruling that the Commonwealth could introduce (through Richard DeStefano) evidence that Torner said he participated in dismembering bodies when he lived in New Jersey. Torner argues that the trial court abused its discretion by failing to analyze the similarities between the prior acts and the killing of Herran; Torner claims his prior acts were so dissimilar that they could not prove his identity as the perpetrator of Herran's murder. Furthermore, Torner argues the trial court failed to consider whether the probative value of the evidence outweighed the potential for unfair prejudice.

We analyze a trial court's evidentiary rulings for an abuse of discretion. ***Commonwealth v. Green***, 271 A.3d 393, 401 (Pa. Super. 2021). That is, a trial court's ruling to admit or exclude evidence "will be reversed only upon a showing that the trial court clearly abused its discretion." ***Id.*** (quoting ***Commonwealth v. Drumheller***, 808 A.2d 893, 904 (Pa. 2002)). "It is not sufficient to persuade the appellate court that it might have reached a different conclusion; it is necessary to show an actual abuse of the discretionary power. An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." ***Commonwealth v. Brown***, 134 A.3d 1097, 1105–06 (Pa. Super. 2016) (quoting ***Commonwealth v. Christine***, 125 A.3d 394, 398 (Pa. 2015)).

Rule 404 of the Pennsylvania Rules of Evidence generally prohibits the use of evidence to show a person's character and prove that the person acted in accordance with that character. Rule 404(b)(2), however, allows a court to admit evidence of a person's "other crime, wrong, or act" for alternative purposes. In criminal cases, this evidence is admissible only if its probative value outweighs its potential for unfair prejudice. "Unfair prejudice means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." *Commonwealth v. Carter*, 320 A.3d 140, 148 (Pa. Super. 2024). A trial court "is not required to sanitize the trial" of all unpleasant facts that may be harmful to the defendant. *See Commonwealth v. Tyson*, 119 A.3d 353, 360 (Pa. Super. 2015). The rule states:

(a) **Character Evidence**.

(1) *Prohibited Uses*. Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.

\* \* \*

(b) **Other Crimes, Wrongs, or Acts**.

(1) *Prohibited Uses*. Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

- 12 -

> (3) *Notice in a Criminal Case*. In a criminal case the prosecutor must provide reasonable written notice in advance of trial so that the defendant has a fair opportunity to meet it, or during trial if the court excuses pretrial notice on good cause shown, of the specific nature, permitted use, and reasoning for the use of any such evidence the prosecutor intends to introduce at trial.

Pa.R.E. 404(a)(1), (b).

For evidence of a defendant's other crimes, wrongs, or acts to establish a "common plan or scheme," a trial court must determine first whether the prior conduct was distinctive. *Green*, 271 A.3d at 402 (citing *Tyson*, 119 A.3d at 359). This entails analyzing the perpetrator's habits or patterns of action, "as well as the time, place, and types of victims typically chosen." *Id.* If the defendant's other acts are distinctive, the trial court must carefully assess whether the evidence is too remote in time to be probative. *Id.* For a defendant's prior acts to prove his identity as the perpetrator of a charged crime, the incidents must be sufficiently "similar that logically the same person has committed both acts." *Id.* (quoting *Commonwealth v. Rush*, 646 A.2d 557, 561 (Pa. 1994)). However, "a perfect match is not required" before a defendant's prior acts may prove his identity. *Commonwealth v. Hicks*, 156 A.3d 1114, 1128 n.8 (Pa. 2017).

Here, the trial court determined that the evidence of Torner's prior acts showed a common plan, such that Torner participated in killing Herran and dismembering Herran's body like he had participated in "cutting up the bodies" when he was younger. Central to the trial court's determination was that "most homicides, unlike this one, do not include evidence that the accused so thoroughly dismembered a human body." Trial Court Opinion, 8/9/24, at 7.

Torner faults the trial court for accepting this general similarity without other specifics that show the prior acts are distinctive to Torner. However, the lack of detail in DeStefano's description arises because DeStefano was repeating what Torner had told him about his past in New Jersey. Torner's prior acts are distinctive to Torner because Torner told DeStefano that he did them, like how Torner told Warren about how he killed and dismembered Herran.[4] The trial court did not abuse its discretion by finding that Torner's statement about cutting up bodies connected him to the crime charged.

The trial court also reasoned that the probative value of DeStefano's testimony "clearly outweighed" any potential for unfair prejudice:

> In this case, because the body of Mr. Herran was so thoroughly destroyed, there was little in the way of physical evidence which could connect [Torner] to the crime. Both [Torner] and his co-defendant denied that [Torner] participated in the crime. The unique fact that Jose Herran's body was dismembered, paired with [Torner's] statements about familiarity with that same unusual conduct, was highly probative of the degree to which [Torner] planned and participated in these crimes.

*Id.* at 8.

We discern no abuse of discretion. The trial court recognized the central issue in this case was the degree to which Torner was involved in killing Herran and dismembering his body. DeStefano's testimony about what Torner told him fit within the permissible purpose for which it was used, to prove Torner's active participation in Herran's murder. The law did not require the trial court

_____

[4] The Commonwealth argued to the jury in line with this limited purpose, that Torner's statements about his prior acts lend credence to his statements about killing and dismembering Herran.

- 14 -

to eliminate the unpleasant details of Torner's own statements to DeStefano. *Tyson*, 119 A.3d at 360. Rather, the trial court recognized the usefulness of DeStefano's testimony given Torner's competing narrative at trial. The trial court did not misapply the law, exercise a manifestly unreasonable judgment, or demonstrate partiality, prejudice, bias or ill-will. Torner's evidentiary issue thus fails.[5]

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 07/10/2025

---

[5] Because the trial court did not abuse its discretion, we do not reach the parties' harmless error arguments.