J-A23035-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| ANTHONY LEE BUSH, | : | |
| | : | |
| Appellant | : | No. 926 WDA 2013 |

Appeal from the Judgment of Sentence entered on April 29, 2013
in the Court of Common Pleas of Allegheny County,
Criminal Division, No. CP-02-CR-0002740-2012

BEFORE:  DONOHUE, ALLEN and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:          **FILED SEPTEMBER 30, 2014**

Anthony Lee Bush ("Bush") appeals from the judgment of sentence imposed following his convictions for murder of the third degree and endangering the welfare of a child.  ***See*** 18 Pa.C.S.A. §§ 2502(c), 4304.  We affirm.

The trial court set forth the relevant factual and procedural history, which we adopt for the purpose of this appeal.  ***See*** Trial Court Opinion, 1/22/14, at 1-4.[1]

On appeal, Bush raises the following questions for our review:

I. Did the trial court err in failing to give an involuntary manslaughter jury instruction as sought by trial counsel?

---

[1] We note that Bush filed a timely court-ordered Pennsylvania Rule of Appellate Procedure 1925(b) Concise Statement of Matters Complained of on Appeal.

II. Was it error to permit the testimony from several medical personnel regarding the efforts to revive [Donovan McKee ("Donovan")] in this case[,] as the cause of death was not at issue and the evidence was not only cumulative but, more importantly, more prejudicial than probative, intended merely to inflame the passions of the jurors?

III. Did the trial court err in admitting photographs into evidence of what looked like blood stains in the apartment[,] when these spots were never determined to be blood, no proof was given that, if it was blood, who the blood belonged to or how long it had been there?

Brief for Appellant at 6 (capitalization omitted).

In his first claim, Bush contends that the trial court erred in denying trial counsel's request for a jury instruction regarding involuntary manslaughter.[2] *Id.* at 15-29. Specifically, he argues that the testimony of Dr. Barbara Ziv, a forensic psychiatrist, regarding Bush's abuse as a child was sufficient to show a version of the evidence that would tend to support a verdict of involuntary manslaughter. *See id.* at 16-29. Specifically, Bush argues that his treatment of Donovan mirrored the treatment he received as a child, and that he did not understand the consequences of his actions. *Id.* at 21. Bush claims that he acted recklessly and grossly negligent when he

---

[2] The Crimes Code defines involuntary manslaughter as follows:

**§ 2504. Involuntary manslaughter**

**(a) General rule.**—A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person.

18 Pa.C.S.A. § 2504(a).

- 2 -

beat Donovan to death and thus an involuntary manslaughter instruction should have been provided. *Id.* at 17, 22-23, 24, 25, 29.

In its Opinion, the trial court analyzed the relevant law regarding requests for a jury instruction, and set forth its reasons for denying the involuntary manslaughter instruction. *See* Trial Court Opinion, 1/22/14, at 4-5. Upon review, we agree with the trial court's determination that the evidence did not support a jury instruction on involuntary manslaughter, and we adopt the trial court's analysis for the purpose of this appeal. *See id.*

In his second claim, Bush asserts that the trial court erred in allowing the testimony of several medical personnel who attempted to revive Donovan when he arrived at the emergency room. Brief for Appellant at 30. Bush argues that because the cause of death was not in question, such testimony was unnecessary, and merely served to prejudice the defense by eliciting an emotional response from the jury. *See id.* at 30-38.

Here, the trial court analyzed the relevant law regarding the admission of evidence, and set forth its reasons for determining that the testimony was relevant and non-prejudicial. *See* Trial Court Opinion, 1/22/14, at 9-11. Upon review, we agree with the sound reasoning of the trial court, and we adopt its analysis for the purpose of this appeal. *See id.*

In his third claim, Bush argues that the trial court erred in admitting photographs of the various stains throughout the apartment because they had not been tested to determine that they were, in fact, blood stains. Brief

for Appellant at 39-41. Bush also argues that even if the stains were blood, without testing, there is no evidence that the stains came from Donovan's blood. *Id.* at 41. Further, Bush claims that because the evidence did not establish that the stains were from Donovan's blood, admission of the photographs, as well as the testimony related to the stains, was irrelevant and prejudicial. *Id.* at 41-44.

Our standard of review regarding the admissibility of photographs is as follows:

> The admission of photographs is a matter vested within the sound discretion of the trial court whose ruling thereon will not be overturned absent an abuse of that discretion…. In determining whether the photographs are admissible, we employ a two-step analysis. First, we consider whether the photograph is inflammatory. If it is, we then consider whether the evidentiary value of the photograph outweighs the likelihood that the photograph will inflame the minds and passions of the jury. Even potentially inflammatory photographs are admissible when the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

*Commonwealth v. Solano*, 906 A.2d 1180, 1191-92 (Pa. 2006) (citations omitted).

Here, the trial court set forth its analysis regarding the admissibility of the photographs. *See* Trial Court Opinion, 1/22/14, at 20-22. Upon our review, we conclude that the trial court did not abuse its discretion in admitting the photographs, and we adopt its analysis for the purpose of this appeal. *See id.*

Judgment of sentence affirmed.

- 4 -

J-A23035-14

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/30/2014

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA

v.                                                    CC: 201202740

ANTHONY BUSH,

Defendant

**OPINION**

The Defendant has appealed from the judgment of sentence entered on April 29, 2013. A review of the record reveals that the Defendant has failed to present any meritorious issues on appeal and, therefore, the judgment of sentence should be affirmed.

The Defendant was charged with Criminal Homicide[1] and Endangering the Welfare of a Child (EWC)[2] in relation to the beating death of his 11-year-old stepson. At the conclusion of a jury trial held before this Court, the Defendant was found guilty of third degree murder and the EWC charge. He appeared before this Court on April 29, 2013 and was sentenced to consecutive terms of imprisonment of 20 to 40 years at the third degree murder charge and three and one half (3 ½) to seven (7) years at the EWC charge. Timely Post-Sentence Motions were filed and were denied on May 2, 2013. This appeal followed.

The evidence presented at trial established that the Defendant lived in the Knoxville section of the City of Pittsburgh with his girlfriend, Cynthia McKee, their five (5) year-old son, Vincere, and her 11 year-old son from another relationship, Donovan. The Defendant had a

---

[1] 18 Pa.C.S.A. §2501(a)
[2] 18 Pa.C.S.A. §4304

history of beating Donovan. On the morning of February 11, 2012, the Defendant awoke angry at Donovan for the child's failure to do his homework the night before, and decided to beat Donovan that day. During the course of that day, the Defendant beat Donovan repeatedly with wooden Kendo swords and a wood 2x2 until they broke, then he used a metal barbell to continue the beatings. At approximately 8:50 p.m., the Defendant called Cynthia at her job at a pizza shop and asked where he could find a needle and thread. He located the items and proceeded to "stitch" up deep gashes on Donovan's head and arm, first pouring alcohol directly into the deep, open wounds, while Donovan screamed. Eventually, Donovan lost consciousness and became cold. Cynthia returned home from her job at approximately 10 p.m. and noticed her son's condition. The Defendant instructed her to say that he fell out of a window. Despite Cynthia's observation of her son's condition, the call to 911 was not made until one (1) hour and 40 minutes later.

Pittsburgh Police Officers arrived at the scene first and found the Defendant holding Donovan, saying that he was sorry and it was all his fault. The police began CPR on Donovan and the paramedics took over resuscitation efforts when they arrived. After a lengthy resuscitation effort, paramedics were able to get a pulse and immediately transported Donovan to Mercy Hospital, a Level 1 Trauma Center. By the time of his arrival the pulse obtained by the paramedics had been lost again, and Mercy initiated resuscitation efforts. Once a pulse was regained, Mercy personnel assessed Donovan's injuries, which included:

- Left posterior upper arm bruising (Trial Transcript, p. 140);
- Left hand laceration in stages of healing (T.T., p. 140);
- Skull deformity and hematoma (T.T. p. 140);
- Left forearm laceration – healing (T.T. p. 140);

2

- Left arm laceration – healing (T.T. p. 140);

- Puncture wound to left calf (T.T. p. 140);

- Right shin laceration (T.T. p. 140);

- Left knee laceration (T.T. p. 141);

- Right thigh laceration (T.T. p. 141);

- Right arm bruising (T.T. p. 141);

- Right shoulder lacerations and abrasions (T.T. p. 141);

- Right clavicle laceration (T.T. p. 141);

- Left arm laceration with homemade suture and thread in arm (T.T. p. 141);

- Right arm laceration (T.T. p. 141);

- Right arm deformity (T.T. p. 141);

- Bruising over entire body (T.T. p. 141);

- Branding marks to right leg (T.T. p. 141); and

- Left leg lacerations both fresh and healing (T.T. p. 141).

When his heart had been beating continuously for 20 minutes, he was transported to Children's Hospital by the specially-trained Children's trauma transport team.

Upon his arrival at Children's Hospital, Donovan's pulse was very weak and he had no measurable blood pressure. He was given multiple doses of epinephrine to keep his heart rate up while an assessment began. It was noted that in addition to the injuries documented by Mercy, that his pupils were fixed and dilated (T.T. p. 148), his lower back was bruised (T.T. p. 149) and his abdomen was distended (T.T. p. 149). Donovan continued to lose pulses, and three rounds of CPR with epinephrine were performed. Eventually, Donovan was pronounced dead at 2:45 a.m. The autopsy performed by Dr. Shakir revealed that Donovan's death had not been caused by a

3

single blow, but rather that the multiple blows to the different parts of his body caused blood vessels throughout his body to rupture and to bleed into his tissue and eventually resulted in a fat embolism in his lungs. Dr. Shakir opined that because the vessels were small and the bleeding occurred slowly, had Donovan received prompt medical treatment and a blood transfusion, his life could have been saved (T.T. p. 274).

The Defendant's natural son, Vincere, was in the apartment that day and witnessed the beatings. He was separately transported to Children's Hospital and was found to have no injuries.

On appeal, the Defendant raises a number of claims directed to the evidence and jury instructions. They are addressed as follows:

1. *Jury Instructions*

Initially, the Defendant argues that this Court erred in denying his request for a jury instruction on involuntary manslaughter. This claim is meritless.

"In reviewing a challenge to the trial court's refusal to give a specific jury instruction, it is the function of [the appellate] court to determine whether the record supports the trial court's decision. In examining the propriety of the instructions a trial court presents to a jury, [the appellate court's] scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the

4

parties and its refusal to give a requested charge does not require reversal unless the Appellant was prejudiced by that refusal." Commonwealth v. Sandusky, 77 A.3d 663, 667 (Pa.Super. 2013).

Pursuant to Section 2504 of our Crimes Code, involuntary manslaughter involves "the doing of an unlawful act in a reckless or grossly negligent manner or the doing of a lawful act in a reckless or grossly negligent manner." 18 Pa.C.S.A. §2504(a). "Since our Supreme Court's decisions in Commonwealth v. White, 490 Pa. 179, 415 A.2d 399 (1980) and Commonwealth v. Williams, 490 Pa. 187, 415 A.2d 403 (1980), it has been settled that 'in a murder prosecution, an involuntary manslaughter charge shall be given only when requested, where the offense has been made an issue in the case and the trial evidence reasonably would support such a verdict.'" Commonwealth v. Banks, 677 A.2d 335, 343 (Pa.Super. 1996).

At trial, the evidence established that the Defendant woke on the morning of February 11, 2012, with the intent to beat Donovan, with sticks, as a punishment for his behavior. The assault began in the morning and spanned the entire day. The Defendant used multiple weapons to beat the child and when one broke, he selected another to continue the beatings. He never sought medical treatment for the child. The Defendant did not deny the beatings or otherwise contradict this evidence; rather, his defense centered on his abusive childhood and its residual effects on his behavior. The evidence presented demonstrated willfulness and an intent to conduct and continue the beatings, as befits a homicide charge, but there was no evidence presented which indicated that this killing was in any way accidental or that would support the reckless or grossly negligent mental state of involuntary manslaughter. Because the evidence did not support a charge of involuntary manslaughter, this Court was well within its discretion in refusing to give the instruction. This claim must fail.

5

2.    *Vincere's Statement to Officer Lane*

Next, the Defendant argues that the trial court erred in allowing the testimony of Officer Angie Lane regarding what Vincere told her. This claim is also meritless.

The "standard of review regarding the admissibility of evidence is an abuse of discretion. 'The admissibility of evidence is a matter addressed to the sound discretion of the trial court and...an appellate court may only reverse upon a showing that the trial court abused its discretion'... 'An abuse of discretion is not a mere error in judgment but, rather, involves bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law.'" Commonwealth v. Collins, 70 A.3d 1245, 1251 (Pa.Super. 2013), internal citations omitted.

Pittsburgh Police Officer Angie Lane was the first police officer to arrive on the scene. After the paramedics arrived and took over resuscitation efforts, she went to the children's' bedroom, where another officer had found Vincere on a safety sweep of the apartment. It was decided amongst the officers that Officer Lane would stay with Vincere. Upon entering the room, Officer Lane spoke to Vincere, and she recounted the conversation as follows:

> Q.    (Ms. Pellegrini): So he rolled over and he said hi. What did you tell him?
>
> A.    (Officer Lane): I said, "Hello. My name is Angie and I'm a police officer. I heard there was a fight here and I just wanted to make sure that you're okay."
>
> Q.    What does he say?
>
> MS. MIDDLEMAN: Objection. Hearsay.
>
> MS. PELLEGRINI: May we approach?
>
> THE COURT: You may.
>
> (A discussion at sidebar was held as follows):
>
> MS. MIDDLEMAN: My objection is that it's hearsay without an acceptable exclusion.

6

MS. PELLEGRINI: Your Honor, I would argue that it's an excited utterance to the child obviously.

THE COURT: Tell me this witness comes next?

MS. PELLEGRINI: She asks him what happened, that there was a fight and she [sic] says no. Poppy and mom was fighting. Poppy was mad at Donovan and he hit him with sticks.

THE COURT: Okay. I'll allow it.

Q. I'm just going to ask you to repeat the last things you said. You wanted to make sure that he was okay.

A. That's correct.

Q. What did he say to you?

A. At the point where the officers shut the door, that's when he rolled over and that's when I had approached him and said, "I just wanted to make sure you're okay," and told him I was there because we heard there had been a fight.

He said, "I'm okay. I wasn't in the fight. The fight was between Donovan and Poppy."

Q. What else does he tell you?

A. I asked him who Poppy was. He said that was his father. And he said Poppy came in and hit Donovan with sticks. And I can't even remember how many sticks he had. But he hit him with sticks until – he told me that Donovan had been crying, and he said eventually Donovan just stopped crying and he fell asleep up in the top bunk.

Q. After he said Donovan fell asleep on the top bunk, did he tell you what else happened to Donovan?

A. He said that –

MS. MIDDLEMAN: I ask – I'm sorry, Officer. I also object to this as hearsay as well.

THE COURT: Okay. I'll overrule...

Q. So after he said that Donovan fell asleep, did he tell you what his Poppy did then?

7

A.  He said Poppy later came in and pulled him out of the bed and took him out and laid him on our couch.

Q.  Did you ask him, Vincere, where he was when this happened?

A.  Vincere –

Q.  Let me rephrase it. Did Vincere tell you that he stayed in the bedroom when Poppy dragged Donovan out of the bed?

A.  Yes. He did tell me that he had stayed in the bedroom.

(T.T. p. 50-52).

Rule 803 of the Pennsylvania Rules of Evidence states, in relevant part:

**_Rule 803._**   **_Exceptions to the Rule Against Hearsay – Regardless of Whether the Declarant is Available as a Witness_**

_The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:_

_...(2)  Excited Utterance.  A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused._

Pa.R.Evid. 803(2).

"To come within the excited utterance exception to the hearsay rule, a statement must be: ... 'a spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person had just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties.'... There is no precise rule as to the length of time passing between the event and the alleged excited utterance... except it must be 'so near the occurrence in both time and place as to exclude the likelihood of its having emanated in whole or in part from his

8

reflective faculties'... Length of time is an element that must be weighed along with other considerations. It varies with the circumstances from case to case. It does not alone decide admissibility. The question is not how long one or when one is seized by an event, but rather was he seized at all. Time itself is not dispositive and is determined, ad hoc, case by case." Commonwealth v. Watson, 627 A.2d 785, 788 (Pa.Super. 1993), internal citations omitted.

Here, the evidence established that Vincere was in the home and witnessed the Defendant beating Donovan repeatedly over the course of the day and then being dragged from his bed. After witnessing the horrific beatings of his brother, Vincere hid under his covers. Officer Lane was the first person who spoke to Vincere, and as soon as she did, he immediately recounted what had happened.

Given the circumstances, Vincere's statements clearly fell with the purview of the excited utterance exception to the hearsay rule. The statements were made at Vincere's first opportunity to speak to anyone outside of his family and they were made spontaneously, in response to question about Vincere's own health and well-being. The statements made by the obviously frightened child were not the product of reflected thought, and were, in fact, corroborated by the Defendant's own confession. The statements were clear hearsay exceptions, and this Court was well within its discretion in allowing their admission. This claim must fail.

3.      *Medical Testimony of Drs. Rockacy and Conti and Social Worker Mary Thompson*

Next, the Defendant argues that this Court erred in allowing the testimony from medical witnesses Drs. Rockacy and Conti and social worker Mary Thompson because their testimony was both irrelevant and prejudicial. This claim is meritless.

At trial, the Commonwealth presented the testimony of Dr. Douglas Rockacy, the Mercy Hospital Emergency Room attending physician who resuscitated and treated Donovan, Mercy

9

Hospital Social Worker Mary Thompson who documented Donovan's injuries, made a report of suspected child abuse and helped arrange his transport to Children's Hospital and Dr. Kavitha Conti, the Children's Hospital Emergency Room attending physician who treated and resuscitated Donovan, documented his injuries and eventually pronounced him dead. Defense counsel objected to their testimony as being both prejudicial and irrelevant:

> MS. MIDDLEMAN: I have a motion in limine with regard to the next three witnesses.
>
> My understanding is Dr. Rockacy, Mary Thompson and Dr. Conti will be testifying about efforts made to resuscitate Donovan at Mercy Hospital, and they will also be testifying about their observations regarding his injuries.
>
> My objection is that we have Dr. Shakir to testify, who will be testifying in detail about each injury and how that injury contributed to the death of Donovan McKee.
>
> The testimony from the doctors who tried to save him will be merely repetitive in an effort to engage the emotion and sympathy of the jury.
>
> MS. PELLEGRINI: Judge, this child was not deceased at the time. Any medical treatment and efforts to save him and the documentation of his injuries at the time when he was treated are relevant to this case.
>
> THE COURT: I am constrained to agree with the Commonwealth, and the motion in limine is denied.
>
> MS. MIDDLEMAN: Thank you.

(T.T. p. 99-100).

The admission of evidence is controlled by Rule 402 of the Pennsylvania Rules of Evidence, which states:

> *Rule 402.     General Admissibility of Relevant Evidence*
>
> *All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible.*

Pa.R.Evid. 402.

10

"In determining the admissibility of evidence, the trial court must decide whether the evidence is relevant and, if so, whether its probative value outweighs its prejudicial effect... 'Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact.'" Commonwealth v. Hawk, 709 A.2d 373, 376 (Pa. 1998). As noted above, the admission of evidence is within the discretion of the trial court. See Collins, *supra*.

At the time Drs. Rockacy and Conti and Ms. Thompson treated and assessed Donovan's injuries, he was still alive thus, as Ms. Pellegrini pointed out, their testimony forms part of the narrative of the events leading to Donovan's death. A careful examination of their testimony reveals that it is not cumulative, but rather concerned each of their individual roles in Donovan's treatment

Neither was the testimony of any of the three particularly graphic or gratuitous. Donovan's new or recent injuries as they appeared upon his arrival to the hospital were relevant to the beatings he sustained and the cause of his death, and the old injuries were similarly relevant to the endangerment count, which was charged as a course of conduct.

As discussed more fully below (see Issue #5, below), the guilty finding at third degree murder demonstrates that the jury was not prejudiced or otherwise so affected by the testimony as to be unable to render a lesser verdict than that which the evidence clearly supported. The testimony of Drs. Rockacy and Conti and of Ms. Thompson was relevant, non-prejudicial and, thus, clearly admissible and this Court did not err in allowing it. This claim must fail.

11

*4.    Post-Arrest Silence*

Next, the Defendant argues that the Commonwealth erred in eliciting testimony regarding the Defendant's post-arrest silence, and that this Court erred in denying a mistrial in that regard. Though the Court sustained the Defendant's objection to the testimony, it did not err in denying a mistrial. This claim is meritless.

Pittsburgh Police Officer Brandon Nee was one of the officers on the scene and eventually transported the Defendant to the Zone 3 Headquarters. During Ms. Pellegrini's direct examination of Officer Nee, the following occurred:

> Q.    (Ms. Pellegrini):  At some point did it become your responsibility with your partner Officer Connelly to transport the defendant in this case back to headquarters?
>
> A.    (Officer Nee):  Yes.
>
> Q.    Was he allowed to put clothing on?
>
> A.    Yes.
>
> Q.    And how did you transport him?  Did you have a marked vehicle?
>
> A.    Yes, we had a marked Chevy Impala.
>
> Q.    And he was placed in the back?
>
> A.    Correct.
>
> Q.    And how long do you think it would take to get from the Knox Avenue address to headquarters on the North Side?
>
> A.    It was five to ten minutes.  It was raining out.
>
> Q.    When you took the defendant out of the building, the Knox Avenue building, had Donovan been taken away by paramedics yet?
>
> A.    Yes.
>
> Q.    Do you know where Vincere was?

12

A. I'm not sure where he was at that time.

Q. And do you know where Cynthia was?

A. Yes.

Q. Was she still in the building, in the apartment building?

A. Yes, she was.

Q. During that five to ten minute ride, did the defendant say anything to you?

A. No.

Q. Did he ever once ask about Donovan?

A. No.

Q. Did he ever ask?

MS. MIDDLEMAN: Your Honor, I object to this and ask that we approach.

THE COURT: You may.

(A discussion was held at sidebar as follows):

MS. MIDDLEMAN: He was handcuffed and placed in a police car. He was under arrest. He said nothing. He didn't ask any questions. That's post-arrest silent [sic].

He doesn't – he has the right to remain silent at that point.

THE COURT: I agree. You can't comment on his silence.

MS. PELLEGRINI: Okay.

THE COURT: I can give them a cautionary instruction, however I think it will just make it more obvious. Plus the truth is, it apparently was a statement made eventually.

MS. MIDDLEMAN: Yes, but –

THE COURT: I mean if you want me to, I can caution them.

MS. MIDDLEMAN: No, I think a cautionary instruction would just draw more attention, but I think –

13

THE COURT: I agree.

MS. MIDDLEMAN: -if I don't ask for a mistrial – so I have to ask for a mistrial.

THE COURT: I'll deny a mistrial.

MS. MIDDLEMAN: Okay. Thank you.

(T.T. p. 75-77).

Generally speaking, "a trial court is required to grant a mistrial only where the alleged prejudicial event may reasonably be said to have deprived the defendant of a fair and impartial trial... Review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will...discretion is abused. A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. A mistrial is not necessary where cautionary instructions are adequate to overcome prejudice." Commonwealth v. Fortenbaugh, 69 A.3d 191, 193 (Pa. 2013), internal citations omitted.

Our Courts have been "consistent in prohibiting the post-arrest silence of an accused to be used to his detriment." Commonwealth v. Moury, 992 A.2d 162, 176 (Pa.Super. 2010). However, "if the Commonwealth mentions a defendant's post-arrest silence, the court might still be able to cure any prejudice through prompt and adequate cautionary instructions... To evaluate whether cautionary instructions can cure a reference to a defendant's post-arrest silence, 'court must consider (1) the nature of the reference to the defendant's silence; (2) how it was elicited; (3) whether the district attorney exploited it; and (4) the promptness and adequacy of the

14

cautionary instructions... If the reference to the defendant's silence was such that it incurably compromised the jury's objectivity and would deprive the defendant of a fair trial, then the court should grant a mistrial... A reference to a defendant's post-arrest silence could also constitute harmless error... The reference is harmless error if: the appellate court concluded beyond a reasonable doubt that the error could not have contributed to the verdict. If there is a reasonable probability that the error may have contributed to the verdict, it is not harmless. In reaching that conclusion, the reviewing court will find an error harmless where the uncontradicted evidence of guilt is so overwhelming, so that by comparison the error is insignificant. If a reference to a defendant's post-arrest silence is harmless error, then a new trial is not warranted." Id.

Although the Defendant is correct that the Commonwealth did improperly refer to his post-arrest silence, it is also clear from the record that the reference was merely a harmless error. The line of questioning was quickly objected to by defense counsel, so the reference to his silence was minimal. In contrast to the overwhelming evidence of the Defendant's guilt – including his own confession – the brief reference was minor in comparison. Reviewing the record in its entirety, there is no reasonable argument that this brief reference caused or contributed to the guilty verdict in any way.

It also bears mention that this Court offered to give a cautionary instruction, but that defense counsel declined because she felt it would draw more attention to the reference. Although this Court feels her strategy was sound and her decision wise, it was willing to give the instruction and would have done so had she requested.

Ultimately, it is clear that while the Commonwealth did err in commenting on the Defendant's post-arrest silence, that error was harmless and did not rise to the level of prejudice

15

such that a mistrial was required. This Court was well within its discretion in denying defense counsel's request for a mistrial. This claim must fail.

5. *Autopsy Photos*

The Defendant next argues that this Court erred in admitting the autopsy photos because they were more prejudicial than probative and were only used to inflame the passions of the jury. This claim is meritless.

It is well-established that "photographs of a murder victim are not per se inadmissible and it is a decision within the sound discretion of the trial court. Only an abuse of discretion will constitute reversible error." Commonwealth v. Funk, 29 A.2d 28, 32 (Pa.Super. 2011). "When considering the admissibility of photographs of a homicide victim, which by their very nature can be unpleasant, disturbing and even brutal, the trial court must engage in a two-step analysis: First a [trial] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors." Commonwealth v. Johnson, 42 A.3d 1017, 1033-4 (Pa. 2012).

Photographs may be admitted when they are "probative of the element of specific intent to kill." Commonwealth v. Brown, 711 A.2d 444, 453 (Pa. 1998). As our Supreme Court held in Commonwealth v. Rush, 646 A.2d 557 (Pa. 1994), "the condition of the victim's body provides evidence of the assailant's intent, and, even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs." Commonwealth v. Rush, 646 A.2d 557, 560 (Pa. 1994). In that case, the Court noted that "although there was testimony from a medical examiner regarding the

16

condition of the victim's body, admission of the photographs was well grounded. The photos served to provide the jury with a better understanding of the crime scene. They also exposed the malicious manner in which the murder was committed. The jurors, by gaining insight into the full extent of the harm wrought, were placed in a better position to assess the nature and intent of the crime's perpetrator. 'A jury can often best perform its function if it has not been unduly insulated from gaining a full understanding of the crime itself.'" Id.

Here, the Commonwealth introduced a number of autopsy photographs depicting the numerous injuries covering Donovan's body over defense counsel's objection. After reviewing the photographs and some discussion with counsel, this Court found that the photographs were not repetitive or overly gruesome so as to render them prejudicial, but requested that one photograph of the victim's entire body be cropped:

> THE COURT: Okay. I would say certainly there are enough of them. One of the victim nude, his genitals are blacked out covered up.
>
> MS. MIDDLEMAN: Yes, Your Honor.
>
> THE COURT: There's only one. The rest of them, although there are a ton of them, do not seem to be particularly repetitive.
>
> I would point out for the record that the excess blood, if there was any that existed, has been wiped away, and I do think they have probative value. So your objection will be overruled.
>
> ...THE COURT: I don't think this one is necessary.
>
> MS. PELLEGRINI: The first one?
>
> THE COURT: Yes.
>
> MS. PELLEGRINI: That's fine. I can take that out.
>
> THE COURT: I'm going to exclude the first one with the genitals covered. I think there are enough that the rest of them – it's just a little shocking.

17

MS. PELLEGRINI: Right. Just so the Court is aware that the reason that I chose and I would argue to use it, and I'll go back and double check, and I might have another photograph, is there's one distinct bruise on his chest that the doctor is going to say could have been caused by the two-by-two.

THE COURT: He can probably testify to that, and if there's no problem with the cross —

MS. PELLEGRINI: What if I cropped the picture?

THE COURT: Yeah, crop it like from the hips down. We are going to crop No. 1.

MS. MIDDLEMAN: Your Honor, there are photographs of every part of that child's body, and I understand the boy laying on the cold, hard, metal autopsy table — I understand that the prosecution would like to present that so the jury can be upset and inflamed —

MS. PELLEGRINI: No.

MS. MIDDLEMAN: - but that's the only real evidentiary value that that has, because we have separate photographs of his head and his arms and his chest. We don't need that one.

MS. PELLEGRINI: Okay, first of all, just for the record, I'm not using these photographs to inflame the emotions of the jury.

MS. MIDDLEMAN: I apologize.

THE COURT: Speak to me.

MS. MIDDLEMAN: There's the risk that it will inflame. I apologize for that characterization. I did not mean it in that manner.

MS. PELLEGRINI: I will make every attempt, Your Honor, to crop the first photograph.

THE COURT: Thank you...

...MS. MIDDLEMAN: But I would just on the first autopsy photograph — I apologize to the Court and Ms. Pellegrini, it has the potential for inflaming the jury and it isn't necessary.

THE COURT: It is what it is and the jury can be inflamed by most of the evidence that the Commonwealth has presented here.

18

So I was inclined to allow the first photograph in anyhow, but I do think since he was a young child, that I would prefer that it be cropped.

MS. PELLEGRINI: Sure. I'll see what we can do.

THE COURT: Thank you. Get a pair of scissors and cut it off.

(T.T. p. 179-182).

The nature of this case – where Donovan was beaten to death by many blows to many parts of his body – makes photographs of his body and injuries particularly important. Much as in the Rush and Brown cases, above, the bruises, scars and gashes on Donovan's body were the visual manifestation of the Defendant's intent, and it was important for the jury to have an image of the damage and injury the Defendant caused. Even though the Defendant admitted to the beatings, his defense attempted to mitigate or excuse his actions by discussing his bad childhood and his psychiatric diagnoses. The photographs were necessary for the jury to envision the intent involved in the infliction of so many blows.

It is also significant that the Defendant was convicted of third-degree murder, rather than first-degree. To this Court's mind, the evidence presented clearly demonstrated the malice and specific intent necessary to support a conviction of first-degree murder. The fact that the jury instead returned a verdict of third-degree murder indicates that they were not overly prejudiced or in any way overcome with emotion such that they were unable to render a fair verdict. The photos clearly did not influence the jury's verdict or prejudice them in any way. As this Court has often stated, all evidence presented by the Commonwealth is, by its very nature, prejudicial to the Defendant. The photos were certainly not more prejudicial than any of the other evidence and this Court was well within its discretion in permitting their admission. This claim must fail.

19

6.    *Crime Scene Photos*

Finally, the Defendant argues that this court erred in admitting photographs of the blood stains throughout the apartment because the police never tested the stains to establish they were actually blood. This claim is meritless.

During the testimony of Homicide Detective Scott Evans, the Commonwealth introduced a number of photographs of blood splatter and staining throughout the apartment and in Donovan's bedroom. During Detective Evans' testimony, it was revealed that the mobile crime unit did not process the various blood stains, even though they had been requested to. By the time it was discovered months later, the scene had already been released.

At trial, Detective Evans viewed various photographs and identified what appeared to be blood – though he could not state with certainty that it was blood:

> Q.    (Ms. Pellegrini): What about the wall?
>
> A.    (Det. Evans): There appeared to be staining, bloodstaining along this wall, blood splatter.
>
> MS. MIDDLEMAN:    I object to the Detective's conclusion that that's bloodstaining unless it was tested.
>
> THE COURT: I think he said it appeared to be. So I'll overrule the objection....
>
> ...Q.    Beginning with Commonwealth Exhibit 26, what do you – what do you see?
>
> A.    In the hallway area here on the base molding, there appears to be a free falling blood drop on the base molding.
>
> Q.    Commonwealth Exhibit No. 27?
>
> A.    What appeared to be blood smearing on the walls and the molding of the doorway leading into the bathroom...
>
> ...MS. MIDDLEMAN: Your Honor, can we approach?
>
> THE COURT: Yes.

20

(A discussion at sidebar was held as follows):

MS. MIDDLEMAN: Given that the prosecution has elicited evidence that these suspicious looking stains were never analyzed and never tested and never swabbed, it would appear that they are unable to prove that they were blood.

Even if they were able to prove that they were blood or had the look of blood, they can't prove whose blood it was or how long it was there. Therefore, making them irrelevant to the case.

So I make a motion in limine with regard to photographs and conversation and discussion about the mysterious stains in the apartment.

THE COURT: I think as long as we go with what appears to be blood or brown-red stains, then the jury can draw their own conclusions. Your objection is overruled.

(T.T. p. 89, 91-2, 93).

A review of the record reveals that there was no testimony that the stains actually were blood, merely that they appeared to be blood to a homicide detective with many years of experience. This distinction was carefully made throughout the testimony. Although the blood was not tested to determine its origin, that it was Donovan's is a fair assumption since he was the only person with open wounds in that apartment, he had just been subjected to a series of violent beatings and his blood was found on the broken 2x2 used in the beatings and on the bed sheets immediately near and directly below the bedroom blood spatter (See T.T., p. 173-174, 200-201).

This argument is somewhat disingenuous given defense counsel's admission in her closing argument. She stated:

MS. MIDDLEMAN: Things happen because they happen. Not because they're somebody's fault or that it even makes a difference. But it is what it is.

The detective on this case said, "I told them to test for blood. They didn't test for blood. I'm sorry."

I'm not saying it's not blood. I'm not a moron. It's probably blood. But we don't know whose. We don't know how long. I suspect it's a reasonable inference that it's Donovan's blood.

21

(T.T. p. 459). Although Ms. Middleman qualified her statement by saying "we don't know whose. We don't know how long," she admits it was a reasonable inference to conclude that the stains were blood and that the blood was Donovan's – just as this Court allowed the jury to draw their own conclusions from the evidence.

Ultimately, as with the other evidentiary issues, the evidence is relevant and clearly more probative than prejudicial. As the Rush Court noted, the photos give the jury a better understanding of both the crime scene and how the murder was committed. See Rush, *supra*. As discussed repeatedly, above, had the jury been so overcome with emotion or blinded by prejudice caused by this testimony, they would certainly not have been able to return a verdict to the third-degree homicide charge. This Court was well within its discretion in allowing the testimony and photographs. This claim must fail.

Accordingly, for the above reasons of fact and law, the judgment of sentence entered on April 29, 2013 must be affirmed.

BY THE COURT:

_____, J.

January 22, 2014