J-A18032-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JOHNATHAN BLAIR MAINES | : | |
| | : | |
| Appellant | : | No. 894 WDA 2021 |

Appeal from the Judgment of Sentence Entered March 25, 2019
In the Court of Common Pleas of Clearfield County Criminal Division at
No(s): CP-17-CR-0000345-2018

BEFORE:  STABILE, J., MURRAY, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED:  November 15, 2022**

Jonathan Blair Maines was convicted and sentenced for one count each of third-degree murder and recklessly endangering another person ("REAP"), and two counts each of aggravated assault and simple assault.[1] Maines appealed and challenges the sufficiency and weight of the evidence. He also challenges the admission of evidence and the denial of his motion for a new trial. We affirm.

The Commonwealth presented evidence of the following at trial. Ashley Storm testified that on March 20, 2018, she lived at a residence with Maines, Rick Weatherholtz, Jesse Breeden, and Keith Pinter. N.T., Trial, 1/28/19, at 54, 57-58. At the time, Storm and Maines were romantically involved. *Id.* at 58. She testified that the night before, they all were ingesting

_____

[1] 18 Pa.C.S.A. §§ 2502(c), 2705, 2702(a)(1), 2702(a)(4), 2701(a)(1), and 2701(a)(4), respectively.

methamphetamine and marijuana, along with the victim, Joshua Sahm. *Id.* at 59, 60. She testified that Weatherholtz and Breeden left the house that morning. *Id.* at 66. Pinter remained downstairs while she, Maines, and the victim were in her bedroom. *Id.* at 67. Storm left to go to the bathroom and Maines followed her to the bathroom and asked what she was doing. *Id.* at 70. After telling him that she needed to use the bathroom, Maines left the bathroom. *Id.*

While Storm was in the bathroom she heard someone in the bedroom say, "So you're going to kill me, huh?" *Id.* at 70, 71. When she left the bathroom, she saw Maines holding a knife. *Id.* at 73. Maines ran out of the bedroom, towards her, and said, "Go, go, baby, we got to go." *Id.* She testified that Maines pushed her downstairs and "[h]e was jumping around, flailing his hands." *Id.* at 74. She asked Maines what he did, and he replied that "he didn't know." *Id.* While downstairs they encountered Pinter. All three ran outside, and Pinter said that he was leaving since Storm intended to call 911. *Id.* at 75. She testified that she intended to call 911 because the victim had been stabbed. *Id.* Storm and Maines eventually ran back into the house. *Id.* at 77. Storm testified that when she entered the house, she saw "a lot of blood" in the hallway upstairs and the victim lying in a puddle of blood at the bottom of the steps. *Id.* at 78, 79.

She also testified that Maines asked her "if [the victim] was dead" and she replied that it looked like it. *Id.* at 78. Maines washed his hands and

changed his clothes. *Id.* at 80. Before he changed, he was wearing camouflage pants. He hid those clothes "downstairs, on the back stairs." *Id.* at 79, 80.

Storm also said that the day before, someone gave her a "double bladed knife." *Id.* at 81, 186. Storm stated that Maines had the knife the night before and "was just throwing it down and trying to get it to stick into the floor." *Id.* at 187. When she saw the victim on the floor, she noticed what she believed to be her knife in the victim's shoulder blade. *Id.* at 180. However, Storm's knife was recovered at the bottom of the stairwell. *Id.* at 103, 104. She asked Maines if that was her knife and he said, "Actually there was two." *Id.* at 81. Storm testified that she asked Maines for his phone, but he told her that he did not have it. He then told her to hide his phone if she found it and left the house. Storm went back to her bedroom to look for the phone. *Id.* at 82. In her room, she noticed "a lot of blood" in the chair where the victim had been sitting before she left to use the bathroom. *Id.* at 82, 184. She testified that Maines' phone "ended up lighting up in a puddle of blood[.]" *Id.* She used the phone to call 911. *Id.* at 83.

Pinter testified that on the morning of the incident, he was sleeping downstairs and was suddenly awakened by a "garbled scream." N.T., Trial, 1/29/19, at 108. He testified that it sounded "like their air, was like, being choked off, kind of like a weak scream." *Id.* He heard the screaming coming from upstairs and heard, "Kill me, will you." *Id.* at 109. He thought that it was his imagination but then he heard the screaming again and a scuffle. *Id.* at 110. He again heard, "Kill me, will you." *Id.* Pinter walked towards the

staircase and saw Maines backing out of Storm's bedroom. ***Id.*** He then saw the victim come out of the bedroom while leaning against the wall. ***Id.*** at 111. At this point, Storm exited the bathroom and she and Maines ran downstairs. ***Id.*** at 111, 112. The three of them exited the house and Pinter saw blood spatter on Maines' camouflage pants. ***Id.*** at 114. Storm and Maines told Pinter that the victim had a knife sticking out of him. ***Id.*** at 113. Pinter left the residence and went to a friend's house. ***Id.*** at 115.

Dr. Harry Nachlas Kamerow performed an autopsy of the victim. ***Id.*** at 7. He testified that the victim had a stab wound in his back and two stab wounds to his neck. ***Id.*** at 16, 17. At the time of the autopsy, a knife was still in the victim's back. ***Id.*** at 16. Dr. Kamerow determined that the knife was inserted with such force that it broke the victim's ribs. ***Id.*** at 22. Dr. Kamerow testified that the lacerations in the victim's neck were consistent with the knife removed from his body. ***Id.*** at 32, 33.

During Dr. Kamerow's testimony, defense counsel objected to the admission of a photo taken during the autopsy. ***Id.*** at 31. He argued that it was prejudicial and that the jury did not need to see the photograph. ***Id.*** He suggested that it would be enough for Dr. Kamerow to testify about the victim's injuries. ***Id.*** The court overruled the objection. ***Id.*** at 32. Dr. Kamerow proceeded to describe the victim's injuries using the photograph. He testified that the victim's cause of death was a result of the stab wounds to his neck and back and that the manner of death was a homicide. ***Id.*** at 42.

Joseph Kukosky of the Pennsylvania State Police testified as a forensic DNA expert. *Id.* at 71. He testified that Maines' DNA was found on the camouflage pants and the blood stain on the pants contained the victim's DNA. *Id.* at 91, 92. He also testified that two other unknown DNA profiles were recovered from the waistband, zipper pull, and button of Maines' pants. *Id.* at 100.

The Commonwealth also presented testimony from Gregory Collins, a warden at the Clearfield County Jail. N.T., Trial, 1/30/19, at 4. Collins explained that Maines was currently an inmate at the jail. *Id.* at 6. Counsel did not object to this testimony. *Id.* Collins testified about the contents of recorded phone calls from Maines. *Id.* at 7-10. Before the Commonwealth played the first call for the jury, counsel objected. *Id.* at 7-8. He argued that the recording identified Maines as an inmate and that it would be prejudicial. *Id.* at 8. The court overruled the objection.

After a four-day trial, the jury returned guilty verdicts for the above-referenced offenses. The trial court sentenced Maines to 20 to 40 years' incarceration. Maines filed a post-sentence motion, and the court held a hearing.[2] Maines challenged the sufficiency and weight of the evidence. He also raised issues with the court's admission of the autopsy photograph and the prison phone calls. The court denied the motion. *See* Order, filed 9/10/19.

---

[2] The court granted Maines an extension to file his post-sentence motion.

- 5 -

On August 27, 2019, Maines filed a post-sentence motion for a new trial pursuant to Rule 720(C) of the Pennsylvania Rules of Criminal Procedure. He alleged that eight days beforehand, on August 19, he had received "information from a known witness, not previously known by [Maines]." Post Sentence Motion for New Trial, filed 8/27/19, at ¶ 9. The witness, Catherine Anderson, claimed that after Pinter left the scene of the crime, he went to her house. She alleged that Pinter had blood on his shirt and pants and that she told Pinter that he could not stay at the house. *Id.* at ¶ 10(a)-(c). Anderson also claimed that she spoke with Storm who told her that she and Pinter were in the bedroom when the victim was stabbed and that they both had knives in their hands. *Id.* at ¶ 10(e)(i)-(iv). Storm allegedly told Anderson that an argument ensued, and the victim was stabbed. *Id.* at ¶ 10(e)(v). Anderson also claimed that Maines was not involved in the stabbing. *Id.* at ¶ 10(e)(vi).

At a hearing on the motion,[3] defense counsel explained that even though he had served Anderson with a subpoena the day before, she had failed to appear at the hearing. Counsel stated that he had received a message from her that "she was having difficulty getting transportation." N.T., Post Sentence Motion 720(C), 7/6/21, at 3.[4] Counsel noted his efforts to track her down included contacting "ten different people, probably visited I don't know how

---

[3] The hearing was scheduled for September 24, 2019. For unknown reasons, the hearing was continued multiple times until July 6, 2021.

[4] Before the hearing, Maines filed a direct appeal with this Court. However, upon his request, we remanded the case to allow the court to dispose of the Rule 720(C) motion.

many different residences throughout the southern part of the county." *Id.* at 5.

Based on Anderson's failure to appear, counsel requested a continuance. The court denied the request noting that "there is no guarantee that your witness will show up at that time." *Id.* at 4. It also stated that the case had been scheduled "for a considerable period of time[,]" considering the motion was filed two years prior. *Id.* at 8, 9. Maines filed a motion for reconsideration alleging that Anderson had failed to appear at the hearing due to "various difficulties," including "the passing of her grandmother within the past week, her son being life-flighted for a head injury from an accident with a hammer just two (2) days prior to said hearing, and lack of transportation." Motion for Reconsideration, filed 7/7/21, at ¶ 13. Counsel maintained that Anderson remained willing to testify. *Id.* at ¶ 14. The court denied the motion and this timely appeal followed.

Maines raises the following issues before this Court:

> I.   Whether sufficient evidence was presented at trial to support convictions for murder of the third degree, aggravated assault, simple assault and recklessly endangering another person.
>
>> a.  Whether sufficient evidence was presented at trial to support a conviction for murder of the third degree.
>>
>> b.  Whether sufficient evidence was presented at trial to support a conviction for aggravated assault.
>>
>> c.  Whether sufficient evidence was presented at trial to support a conviction for simple assault.

d. Whether sufficient evidence was presented at trial to support a conviction for recklessly endangering another person.

II. Whether [Maines'] convictions for murder of the third degree, aggravated assault, simple assault and recklessly endangering another person were against the weight of the evidence.

III. Whether the lower court erred by allowing the Commonwealth to, over defense counsel's objection, admit into evidence and publish to the jury an inflammatory photograph from the victim's autopsy.

IV. Whether the lower court erred by allowing the Commonwealth to present inflammatory evidence of [Maines'] incarceration.

V. Whether the lower court erred by denying [Maines'] request for a continuance and in turn denying [Maines'] post sentence motion pursuant to P.R.Crim.P. 720(c).

Maines' Br. at 6-7 (answers of trial court omitted).

**Sufficiency of the Evidence**

Maines' first issue addresses the sufficiency of the evidence for each of his convictions. When presented with a challenge to the sufficiency of the evidence we must determine whether the evidence when viewed in the light most favorable to the Commonwealth, with "all reasonable inferences drawn therefrom," demonstrates that the Commonwealth has proven each element of the crime beyond a reasonable doubt. ***Commonwealth v. Murray***, 83 A.3d 137, 150-51 (Pa. 2013). "The Commonwealth may sustain its burden of proving every element beyond a reasonable doubt by means of wholly circumstantial evidence." ***Commonwealth v. Wanner***, 158 A.3d 714, 718

(Pa.Super. 2017) (citation omitted). "Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." ***Commonwealth v. Gause***, 164 A.3d 532, 540 (Pa.Super. 2017) (citations omitted). We now address each conviction separately.

*Third-Degree Murder*

Maines argues that the evidence was too weak and inconclusive to prove that it was he who killed the victim and that the killing was with malice. He claims that even considering the standard of review, "no eye-witnesses observed [Maines] in the same room with the victim at the time of the alleged stabbing." Maines' Br. at 30. He also maintains that despite evidence of blood splatter throughout Storm's bedroom and the stairwell, there was only "a little blood splatter on one pant-leg of [Maines'] camouflage pants." ***Id.*** at 32. He contends that even considering the Commonwealth's evidence, the scuffling between the victim and Maines "would have surely caused the aggressor's hands, arms, and shirt to come into contact with the victim's blood." ***Id.*** He further emphasizes that Kukosky testified that Maines' DNA was not found on the handle of the murder weapon and that three unidentified DNA profiles were found on the zipper of Maines' pants. He argues that this evidence shows "that someone other than [Maines] had been wearing the pants, and could have been wearing the pants at the time of the incident." ***Id.*** at 34.

The Commonwealth presents sufficient evidence of third-degree murder where it proves "the killing of an individual with malice." ***Commonwealth v. Jones***, 271 A.3d 452, 458 (Pa.Super. 2021) (citation omitted). "Malice includes not only particular ill will toward the victim, but also wickedness of disposition, hardness of heart, wantonness, and cruelty, recklessness of consequences, and conscious disregard by the defendant of an unjustified and extremely high risk that his actions may cause serious bodily harm." ***Id.*** Malice is inferred "from the use of a deadly weapon on a vital part of the body." ***Commonwealth v. Seibert***, 622 A.2d 361, 364 (Pa.Super. 1993); ***see also Commonwealth v. Blakeney***, 946 A.2d 645, 652 (Pa. 2008) (noting neck is a vital part of the body).

Here, the trial court determined that the evidence sufficiently established the crime of third-degree murder. It explained:

> Multiple witnesses testified that they saw [Maines] and the victim near each other around the time of the stabbing. They also testified that they saw no one else in the house at that time other than the victim, [Maines], Ms. Storm, and Mr. Pinter. Both Ms. Storm and Mr. Pinter said they heard [Maines] say they needed to go. Ms. Storm testified that [Maines] asked her to lie and say he was not at the scene and hide his cell phone if she found it. DNA evidence was also presented, which showed that a pair of pants [Maines] was wearing at the time of the incident had both his DNA and blood from the victim. Those are the same pair of pants Ms. Storm testified that she saw [Maines] change out of and hide before he ran from the scene. The doctor testified that the victim died from stab wounds caused by a knife that the witnesses saw [Maines] playing with earlier that day and the prior night.

Opinion and Order, filed 2/5/20, at 5. We agree with the court.

- 10 -

Viewing the evidence in the light most favorable to the Commonwealth as verdict-winner, the evidence was sufficient to sustain third-degree murder. Though no one saw Maines stab the victim, the evidence established that Maines was last seen in Storm's bedroom with the victim. Both Storm and Pinter testified to hearing the victim yelling out something about "kill me, will you" or "so you're going to kill me huh." The evidence also showed that Maines washed his hands and changed his clothes before leaving the residence, establishing a consciousness of guilt. Additionally, the victim's blood was found on Maines' pants and Maines was seen the night before with one of the knives used to stab the victim. Additionally, as noted above, the use of a deadly weapon on a vital part of the body may provide an inference of a defendant's malice. Here, the Commonwealth presented evidence that the victim was stabbed twice in his neck, a vital part of his body. Furthermore, Dr. Kamerow testified that the victim was stabbed with such force that the knife broke the victim's ribs.

Maines' suggestions of how the evidence could have been interpreted ignore our standard of review for sufficiency challenges, *i.e.*, viewing the evidence in the light most favorable to the Commonwealth, not to Maines. Therefore, we are unpersuaded by his speculative claims that someone else could have been wearing his pants or that more blood should have been on his person and/or his clothes based on the testimony of the Commonwealth's witnesses. The evidence was sufficient.

*Aggravated Assault and Simple Assault*

As it relates to the crime of aggravated assault, Maines alleges that the Commonwealth failed to present sufficient evidence that he caused serious bodily injury to the victim. He also argues that the Commonwealth did not present sufficient evidence that he caused bodily injury to the victim to support the crime of simple assault.

The Crimes Code defines aggravated assault in relevant part as:

A person is guilty of aggravated assault if he:

(1)    attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]

18 Pa.C.S.A. § 2702(a)(1). Serious bodily injury includes "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301 (**"Serious bodily injury"**). A person may be convicted of simple assault where the evidence shows that the individual attempted to cause or intentionally, knowingly, or recklessly caused bodily injury to another. 18 Pa.C.S.A. § 2701(a)(1). Bodily injury is the "[i]mpairment of physical condition or substantial pain." 18 Pa.C.S.A. § 2301 (**"Bodily Injury"**).

While the Commonwealth did not present direct evidence that Maines stabbed the victim with two knives, the Commonwealth presented circumstantial evidence of such. ***See Wanner***, 158 A.3d at 718. The evidence established that the victim was stabbed three times with two separate knives,

once in the back and twice in the neck. Maines had one of these knives the night before the murder and was also seen running from the bedroom with a knife in his hand. This evidence sufficiently established that Maines caused bodily injury. It was also sufficient to establish the lesser-included offense of simple assault, which requires bodily injury. **See Commonwealth v. Walls**, 950 A.2d 1028, 1032 (Pa.Super. 2008) (finding sufficient evidence of aggravated assault where defendant stabbed victim multiple times with a screwdriver in the back, torso, neck, and head).

*Recklessly Endangering Another Person*

To prove REAP, the Commonwealth must show that the defendant "(1) possessed 'a *mens rea* [of] recklessness,' (2) committed a wrongful deed or guilty act ('*actus reus*'), and (3) created by such wrongful deed the danger of death or serious bodily injury to another person." **Commonwealth v. Emler**, 903 A.2d 1273, 1278 (Pa.Super. 2006) (citation omitted). Recklessness is defined as "a conscious disregard of a known risk of death or great bodily harm to another person." **Id.** (citation omitted). REAP "requires the creation of danger, so the Commonwealth must prove the existence of an actual present ability to inflict harm to another." **Commonwealth v. Shaw**, 203 A.3d 281, 284 (Pa.Super. 2019).

Maines argues that the Commonwealth did not present sufficient evidence of his *mens rea*. He claims the prosecution failed to show that he "recklessly did something that placed or may have placed the victim in danger

of death or serious bodily injury." Maines' Br. at 36. This argument is meritless.

Like his arguments for his other offenses, Maines relies heavily on the fact that no one saw him stab the victim. However, as noted above, the Commonwealth may meet its burden by wholly circumstantial evidence. The circumstantial evidence here, viewed in the light most favorable to the Commonwealth, was sufficient to sustain the verdict of REAP. There was ample testimony and other evidence, as recited above, that Maines stabbed the victim in his neck and back. This raised a strong inference of a conscious disregard of an obvious risk of great bodily harm to or death of the victim. That was enough to prove *mens rea* beyond a reasonable doubt. No relief is due.

**Weight of the Evidence**

Maines' next issue challenges the weight of the evidence for all his convictions. He maintains that due to the lack of DNA evidence, lack of significant blood spatter found on his pants or his person, and lack of credibility of the Commonwealth's witnesses, the verdict here shocks the conscience. Maines notes that Storm changed her story multiple times, admitted to being high the night before and the morning of the incident, and owned one of the knives used to stab the victim. He also points out that Pinter testified that he also was high the morning of the incident and that his testimony was inconsistent with Storm's testimony. He notes the testimony of Breeden who testified that he had knives sticking to his bedroom walls and

ceiling. He also argues that the video surveillance shows a person who is not

Maines and that he was not with Storm and Pinter as the witnesses testified.

Our standard of review for a challenge to the weight of the evidence is

well settled:

> A claim alleging the verdict was against the weight of the
> evidence is addressed to the discretion of the trial court.
> Accordingly, an appellate court reviews the exercise of the
> trial court's discretion; it does not answer for itself whether
> the verdict was against the weight of the evidence. It is well
> settled that the jury is free to believe all, part, or none of
> the evidence and to determine the credibility of the
> witnesses, and a new trial based on a weight of the evidence
> claim is only warranted where the jury's verdict is so
> contrary to the evidence that it shocks one's sense of
> justice. In determining whether this standard has been met,
> appellate review is limited to whether the trial judge's
> discretion was properly exercised, and relief will only be
> granted where the facts and inferences of record disclose a
> palpable abuse of discretion.

*Commonwealth v. Houser*, 18 A.3d 1128, 1135-36 (Pa. 2011) (citations

and internal quotation marks omitted).

Here, the trial court determined that "looking at the record as a whole,

the jury's verdict is not so shocking as to cause a miscarriage of justice."

Opinion and Order ("February Order"), filed 2/5/20, at 8 (unpaginated).

> Even if the jury had given more weight to one witness or
> another, it is not contradictory to the verdict. Not only did
> the Commonwealth present multiple witnesses that placed
> [Maines] near the victim at the time of the stabbing, there
> was also DNA evidence of both the victim's and [Maines']
> DNA on the same clothes [Maines] was wearing at the time
> of the incident. [Maines] also argues that because they
> presented a witness who stated [Maines] was not wearing
> shoes later in the evening, it should disprove all other

- 15 -

testimony that [Maines] was in the video. However, it is not unreasonable for the jury to draw reasonable inferences since that particular witness was not present at the scene or time of the incident.

*Id.* at 8-9 (unpaginated). The court incorporated this reasoning for each conviction challenged by Maines. *See id.* at 9.

We see no basis to disturb the trial court's finding. Despite other inconsistencies in their testimony, both Pinter and Storm testified that Maines was near the victim before the stabbing. As factfinder, the jury was tasked with the responsibility of reconciling inconsistencies and assessing the credibility of witnesses and evidence. We cannot, on this record, say the trial court abused its discretion in rejecting his weight claim. No relief is due.

**Admission of Evidence**

Next Maines alleges that the trial court erred by publishing a photograph from the victim's autopsy. He alleges that the photograph was inflammatory because it "inflamed the minds of the jurors and sought undue emotional appeal." Maines' Br. at 52. He argues that even if it was reasonable for the photograph to be shown to Dr. Kamerow, publishing the photograph to the jury was a step too far because it lacked probative value and was highly inflammatory. He further argues that because the court failed to give a cautionary instruction, it left the potential for the jury's minds to be inflamed.

We review a challenge to the admission of evidence for an abuse of discretion. In this Commonwealth, a two-step process is employed for trial courts when considering the admission of photographs of homicide victims,

- 16 -

"which by their very nature can be unpleasant, disturbing, and even brutal[.]" *Commonwealth v. Johnson*, 42 A.3d 1017, 1033 (Pa. 2012) (citation omitted). First, the "court must determine whether the photograph is inflammatory." *Id.* (citation omitted). Second, if the photograph is not inflammatory, the court must determine its relevance and whether it would "assist the jury's understanding of the facts." *Id.* at 1034 (citation omitted). "If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors." *Id.* (citation omitted). Where a witness can testify about the victim's injuries without photographs, "a witness's ability to testify as to the condition of the body does not render photographs *per se* inadmissible." *Id.*; *see Commonwealth v. Rush*, 646 A.2d 557, 560 (Pa. 1994) ("[E]ven where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs").

Here, the court determined that the photograph was not inflammatory because it "did not show the victim's face, and it was a cleaned up picture of the wounds." February Order, at 10. The court found that even if the picture could be considered inflammatory, it had extreme evidentiary value. It also concluded that because the Commonwealth alleged that Maines stabbed the victim, the jury needed to determine whether Maines caused the victim's death. The court stated that without the photograph, "there was no way a jury could have considered the charge of criminal homicide." *Id.* at 11.

The trial court permissibly published to the jury the photograph of the victim. The photograph was necessary to aid Dr. Kamerow in his testimony of the nature and extent of the victim's injuries, which was relevant to show Maines' intent. *See Commonwealth v. Pruitt*, 951 A.2d 307, 319 (Pa. 2008) (stating "photographic images of a homicide victim are often relevant to the intent element of the crime of first-degree murder"). Importantly, Maines was on trial for first-degree murder (although the jury ultimately found him guilty of third-degree murder), such that the photo was relevant to intent. Thus, the photograph was not merely cumulative of Dr. Kamerow's prior testimony. Furthermore, even if Dr. Kamerow could have testified to the victim's injuries without the photographs, this did not make the photographs *per se* inadmissible. Having reviewed the photograph, it is as the court described and was not inflammatory. The photograph only displayed the victim's neck and the injuries to his neck. While the victim's head is visible in the photograph, his face was covered with a towel.

Maines also argues that the court erred by admitting two audio recordings of Maines' telephone conversations while incarcerated. He argues that the recordings were inflammatory because they "prejudicially drew attention to [Maines'] incarceration." Maines' Br. at 60. He alleges that any probative value from the recordings was outweighed by the prejudice of "casting [Maines] as a prison inmate." *Id.*

"[G]enerally no reference may be made at trial in a criminal case to a defendant's arrest or incarceration for a *previous* crime[.]" ***Commonwealth***

*v. Johnson*, 838 A.2d 663, 680 (Pa. 2003) (emphasis added). However, "there is no rule in Pennsylvania which prohibits reference to a defendant's incarceration awaiting trial or arrest for the crimes charged." *Id.* Our courts have admonished "constant reminder[s]" of the defendant's incarcerated status such as the defendant's prison attire since it could "affect a juror's judgment." *See Estelle v. Williams*, 425 U.S. 501, 504-05 (1976); *Johnson*, 838 A.2d at 680-81 (concluding that witness's passing reference to incarcerated status of defendant did not rise to the level of constant reminder of incarcerated status).

Here, the court determined that the reference to Maines' incarceration was brief and was not prejudicial. We discern no error in this conclusion. Maines' incarcerated status was a passing reference and not of the nature of a "constant reminder" of which our Courts have disapproved. Additionally, before the prison calls were played for the jury, Maines' incarcerated status had been mentioned to the jury, without any objection from counsel. *See* N.T., Trial, 1/30/19, at 6. Moreover, the mention of Maines' incarceration was based on crimes for which he was on trial, and therefore the reference was not prohibited. *See Johnson*, 838 A.2d at 681.

**Denial of Continuance**

Maines also alleges that the trial court erred in denying his motion for a continuance. He maintains that the court abused its discretion since he served a subpoena on the witness who failed to appear. He notes that the witness failed to appear at the hearing due to transportation issues. He also maintains

that because it appeared that the witness remained willing to testify and the nature of her testimony, the court should have granted the continuance request.

It is within the court's discretion to grant or deny a continuance request. *See Commonwealth v. Ross*, 57 A.3d 85, 91 (Pa.Super. 2012); Pa.R.Crim.P. 106(A). Here, the court explained that it denied the motion for a continuance because there was no guarantee that the witness would show "even if the request for a continuance was granted." Opinion and Order ("September Order"), filed 9/2/21, at 7. It referenced the many efforts that counsel made to reach the witness and determined that "[i]f Anderson was willing to cooperate with [Maines], as counsel asserted, she could have made her whereabouts known to counsel, instead of requiring him to track her down through numerous people all over the county." *Id.*

We discern no abuse of discretion. Despite counsel's efforts to locate Anderson and his eventual success in serving a subpoena on her, she failed to appear at the hearing. As the court concluded, counsel could not make any guarantees that the witness would appear if the case were continued. Additionally, at the time of the hearing, more than two years had passed from the initial filing of the motion. The court did not abuse its discretion in denying the request.

**After-Discovered Evidence**

Maines also claims that the trial court erred by denying his Rule 720(C) motion. He alleges that the after-discovered evidence was probative and not offered simply to challenge the credibility of the Commonwealth's witnesses.

We review the court's denial of a post-sentence motion for a new trial for an abuse of discretion. *See Commonwealth v. Brooker*, 103 A.3d 325, 332 (Pa.Super. 2014). Rule 720 provides that a defendant may file a post-sentence motion "for a new trial on the ground of after-discovered evidence[.]" Pa.R.Crim.P. 720(C). Before the motion may be granted the defendant must show the evidence: "1) has been discovered after the trial and could not have been obtained at, or prior to, the conclusion of the trial by the exercise of reasonable diligence; 2) is not merely corroborative or cumulative; 3) will not be used solely for impeaching credibility of a witness; [and] 4) is of such nature and character that a different verdict will likely result if a new trial is granted." *Commonwealth v. Brosnick*, 607 A.2d 725, 727 (Pa. 1992) (citation omitted). "[T]he proposed new evidence must be producible and admissible." *Id.* (citation omitted).

The trial court determined that Anderson's testimony would be mere impeachment evidence and would not be likely to result in a different verdict.

> The statements made by [the witness] are intended to undermine the credibility of Storm and Pinter and provide a new theory of the events. Even more, the jury would not be required to believe the testimony of [the witness] over Storm and Pinter. Likewise, [the witness's] testimony does not negate the additional forensic evidence or the testimony of other numerous witnesses presented by the Commonwealth. Therefore, [Maines] cannot establish that

- 21 -

> the evidence is more than impeachment evidence, nor can he establish that it would likely result in a different verdict.

September Order, at 7. The court did not abuse its discretion.

Here, the proffered testimony of the witness directly contradicts the testimony of Storm and Pinter who testified that Maines was last seen in the room alone with the victim. Anderson claims that Storm told her that she, Pinter, and the victim were in the room together and that Maines was not involved. The witness also suggested that Pinter arrived at her home with bloody clothes and that she turned him away. While this evidence does not directly impeach Pinter's testimony, it does impeach his testimony that he was not in the room when the victim was stabbed. Thus, as the court concluded, Maines "cannot establish that the evidence is more than impeachment evidence, nor can he establish that it would likely result in a different verdict." *Id.*

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  11/15/2022